UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KEN WILLIAMS,                          )
                                       )
            Plaintiff,                 )
      v.                               )          CIVIL ACTION
                                       )          NO. 12-10430-JGD
THE CITY OF BROCKTON, et al.,          )
                                       )
            Defendants.                )

# MEMORANDUM OF DECISION AND ORDER
# ON DEFENDANTS' MOTIONS FOR SUMMARY
# JUDGMENT AND ON PLAINTIFF'S MOTION TO STRIKE

November 13, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Ken Williams ("Williams"), is a former officer in the Brockton,

Massachusetts Police Department ("BPD").  He has brought this civil rights action

against the City of Brockton ("City" or "Brockton"), four present and/or former officers

of the BPD,[1] the Brockton Retirement Board, and five individual members of the

Retirement Board[2] (collectively, the "Retirement Board Defendants").  Williams alleges,

in essence, that the defendants engaged in a pattern of retaliation against him after he

---

[1]  The defendant police officers include the former Chief of the BPD, William K. Conlon
("Conlon"); the Interim Chief of the BPD, Emanuel Gomes ("Gomes"); Officer Brian Leary
("Leary"); and former Officer Lon Elliott ("Elliott").

[2]  The defendant members of the Retirement Board include William R. Farmer ("Farmer"),
William E. Parlow ("Parlow"), Matthew J. McLaughlin ("McLaughlin"), Edward P. Mack
("Mack"), and Heidi A. Chuckran ("Chuckran").

advised an African-American businessman to file a complaint with the Internal Affairs Division of the BPD accusing one of Williams' fellow police officers, defendant Lon Elliott, with false arrest and racially offensive conduct. Williams also alleges that the City and the four defendant police officers (collectively, the "Police Defendants") discriminated against him after he became disabled with post-traumatic stress disorder ("PTSD"). By his Complaint, Williams has asserted claims against all of the defendants, pursuant to 42 U.S.C. §§ 1983 and 1988, for violations of his constitutional rights and for payment of attorney's fees incurred by Williams as a result of those violations. (Counts I, III and IV). He has also asserted claims against the four individual police officers for depriving him of his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") (Count II). Each of the individual defendants has been named in both his official and individual capacities.

The matter is before the court on the "Defendants City of Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Motion for Summary Judgment" (Docket No. 119) and on the "Motion for Summary Judgment of the Defendants, Brockton Retirement Board, William R. Farmer, William E. Parlow, Matthew J. McLaughlin, Edward P. Mack & Heidi A. Chuckran" (Docket No. 123). By their motions, the defendants contend that there are no material facts in dispute, and that they are entitled to judgment as a matter of law on all of Williams' claims against them. The matter is also before the court on the plaintiff's "Motion to Strike Celotex Argument from the City's Summary Judgment Motion" (Docket No. 133), by which Williams requests that the

court: "(1) limit the City's argument regarding the First Amendment and ADA claims to the issue of statute of limitations; (2) . . . limit the City's 1983 argument to whether the City violated clearly established law; and (3) . . . limit the City's argument regarding municipal [liability] to whether Williams' custom, practice, or policy claims are time barred."  For all the reasons described below, the plaintiff's motion to strike is DENIED, the Retirement Board Defendants' motion for summary judgment is ALLOWED, and the Police Defendants' motion for summary judgment is ALLOWED IN PART and DENIED IN PART.  The matter shall proceed to trial on the plaintiff's claims against the Police Defendants under 42 U.S.C. § 1983 ("Section 1983"), to the extent they are premised upon the denial of Williams' 2010 request for injured on duty leave and the events surrounding his retirement from the BPD.[3]

---

[3] Concurrent with the issuance of this decision, this court is issuing an order directing the plaintiff to file a statement that more clearly defines the scope of the surviving claims he intends to pursue at trial.

## II.  <u>STATEMENT OF FACTS</u>[4]

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party.  See <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008).  Accordingly, the following facts are relevant to the defendants' motions for summary judgment.[5]

The plaintiff, Williams, was employed as a police officer in the BPD from approximately October 1995 until his retirement on November 12, 2010.  (Compl. (Docket No. 1) ¶ 16; PD SOF ¶ 6; PRPD ¶ 6).  He initially performed work as a patrol-

---

[4]  Unless otherwise indicated, the facts are derived from: (1) the "Defendants City of Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Statement of Undisputed Material Facts in Support of Summary Judgment"("PD SOF") (Docket No. 122) and the exhibits attached thereto ("PD Ex. ___"); (2) the Retirement Board "Defendants Statement of Undisputed Material Facts in Support of Summary Judgment" ("RB SOF") (Docket No. 123) and the exhibits attached thereto ("RB Ex.___"); (3) the "Plaintiff, Ken Williams Response to the Defendants, Brockton Retirement Board Statement of Undisputed Material Facts in Support of Summary Judgment" ("PRRB"), which is set forth on pages 2-4 of Docket No. 138; (4) "Williams Concise Statement of Disputed Material Fact" ("Pl. SOF"), which is set forth on pages 4-8 of Docket No. 138; (5) the "Plaintiff, Ken William's Response to the Defendant's, Conlon, Emmanuel Gomes and Brian Leary's Statement of Undisputed Material Facts in Support of Summary Judgment" ("PRPD"), which is set forth on pages 1-6 of Docket No. 141; (6) "Williams' Concise Statement of Disputed Material Facts" ("Pl. Supp. SOF"), which is set forth on pages 6-12 of Docket No. 141; and (7) the exhibits contained in Volumes I and II of the "Plaintiff's Appendix" (Docket No. 142).  In addition, this court has considered the Opinion and Award that was issued in an arbitration between the City and the Brockton Police Association, and was submitted at the court's request as Exhibit A to Docket No. 160 ("Arbitration Award").

[5]  As detailed herein, the plaintiff has not clearly articulated some of his theories of liability.  The court has done the best it can to describe these theories, based on the plaintiff's written and oral arguments.  Even under the court's expansive interpretation, however, a number of the facts set forth in the plaintiff's Statements of Disputed Material Facts do not appear to have any direct relevance to the issues presently before the court, and the plaintiff has failed to describe the significance of those facts in his opposition papers.  While this court has considered the entire record, only those facts that are material to the matters raised in the pending motions have been included in this court's Statement of Facts.

man, but was later promoted to the position of Generalist Detective. (PD Ex. B at 8). Williams, who is African-American, claims that during his tenure as a police officer, he was one of only a handful of minority officers who were employed by the BPD. (Compl. ¶ 17). The record indicates that the plaintiff performed well in his job, even earning an award as a "Top Cop" in the spring of 2009. (See Pl. Supp. SOF ¶ 44, 58; Pl. Ex. 35).

### The Arrest of Jose Semedo

As indicated above, Williams' claims in this action arise out of events that occurred following the arrest of an African American businessman named Jose Semedo ("Semedo"). Semedo was arrested on a warrant by officers from the BPD on November 20, 2007. (PD SOF ¶ 3(b); Pl. Ex. H ¶ III(1)). One of those officers was defendant Elliott, who was then a Sergeant with the BPD. (Pl. Ex. H ¶ III(1)). During the arrest, Semedo attempted to convince Elliott that the warrant had been recalled, but his efforts were unavailing. (Pl. Ex. C at 4). Elliott not only refused to confirm that the warrant remained outstanding, but he also made racially offensive remarks to Semedo, and mocked Semedo using racially offensive gestures. (Pl. Ex. H ¶ III(11) & (15)).

Following an appearance in and subsequent release from court on November 20, 2007, Semedo went to the bus station where Williams happened to be working a police detail. (Pl. Ex. 15 at 36-38; PD SOF ¶ 3(c); PRPD ¶ 3(c)). Semedo approached Williams and entered into a discussion with the plaintiff in which Semedo recounted details of his arrest, including Elliott's racist comments. (Pl. Ex. 15 at 37-38). Williams advised Semedo to file a complaint with the BPD. (Id.; see also PRPD ¶ 3(e)). Accordingly,

Semedo submitted a letter to the Internal Affairs Division of the BPD in which he described the circumstances of his arrest, including the manner in which Elliott had treated him during the course of the incident. (Pl. Ex. C at 4-5).

In January 2008, the Internal Affairs Division launched an investigation into Semedo's complaint against Elliott. (Pl. Supp. SOF ¶ 12; Pl. Ex. C at 8-13). The investigation included, but was not limited to, interviews with Elliott and witnesses to the incident, the submission of written reports by officers who took part in Semedo's arrest, and a search for documentation regarding the status of any warrants relating to Semedo. (See Pl. Ex. C). The plaintiff claims that by July 2008, Elliott and other members of the BPD had learned about Williams' role in advising Semedo to report the offending conduct. (See Compl. ¶¶ 32-33). It is Williams' contention that the BPD originally tried to cover up the facts relating to Semedo's arrest. (See Pl. Opp. Mem. (Docket No. 140) at 6-7). Eventually, however, Elliott's employment with the BPD was terminated.

## Denial of Williams' 2008 Injured on Duty Claim

Williams contends that the Police Defendants harassed him and took adverse actions against him in retaliation for his involvement in the Semedo matter. (See Compl. ¶¶ 35-41). The first such alleged incident occurred in the summer of 2008, after Williams was injured on duty. Specifically, the record demonstrates that on July 12, 2008, Williams suffered a blood exposure injury in the course of performing his duties as a police officer, and had to remain out of work for a number of weeks. (Pl. Ex. U at 12; Pl. Ex. 14 at 90-91; PD Ex. B at 9). According to Williams, Elliott was responsible for

submitting the plaintiff's claim for injured on duty ("IOD") leave to City Hall so that Williams could receive workers' compensation. (Pl. Ex. 14 at 90-92; PRPD ¶ 3(h)). However, when Williams returned to work in August 2008, he discovered that Elliott had failed to submit the necessary paperwork. (Pl. Ex. 14 at 92; PD Ex. B at 9). As a result of Elliott's conduct, Williams was not credited for sick time while he was away from work, and was reprimanded by his Operations Bureau Commander for abusing his sick leave. (PD Ex. B at 9; Pl. Ex. U at 2, 13). Although the plaintiff's 2008 claim for IOD leave was ultimately submitted by another officer, Williams claims that Elliot's failure to file the paperwork in a timely manner was due to the plaintiff's communications with Semedo, including his effort to encourage Semedo to file a complaint with the BPD, and that Elliott's conduct thereby constituted unlawful retaliation for Williams' exercise of his right to free speech. (See Pl. Ex. 14 at 92-95; Compl. ¶¶ 36, 41 & Count I).

In about October 2008, Williams received a summons to appear and testify at a disciplinary hearing regarding Elliott's conduct toward Semedo. (PD Ex. B at 9-10). Prior to the hearing, Williams encountered one of the Police Defendants, Emanuel Gomes, in the hallway outside the hearing room. (Pl. Ex. 14 at 99-100). According to Williams, Gomes attempted to discourage him from testifying adversely against Elliott. (Id.; Pl. Supp. SOF ¶ 21). However, Williams declined to follow Gomes' advice, and provided testimony and information that was damaging to Elliott. (PD SOF ¶ 3(i); PRPD ¶ 3(i)). Both Elliott and the Chief of the BPD, defendant William K. Conlon, were

among the individuals who were present at the hearing.  (PRPD ¶ 3(i)).  Consequently, they were able to hear Williams' testimony against Elliott.  (See id.).

On December 18, 2008, Williams received notice that the City had denied his IOD claim relating to the blood exposure injury because Williams' attending physician had indicated that Williams could return to work.  (Pl. Ex. U at 2, 6).  The plaintiff disputed the denial, which was upheld by the City on February 25, 2009.  (Id. at 11).  Notwith-standing the stated reason for the denial, Williams asserts that the City's decision was based on his testimony at Elliott's disciplinary hearing, and that the City violated his constitutional rights by retaliating against him for engaging in protected speech.  (See Pl. Ex. 14 at 94-95; PD Ex. B at 10-11; Compl. ¶¶ 59, 62-63).

Williams subsequently filed a grievance against the City concerning the denial of his IOD claim, and a hearing took place before a Grievance Hearing Officer.  (See Pl. Ex. R).  On April 7, 2009, the Hearing Officer issued a decision in which she found that the plaintiff's IOD status should be allowed.  (Id.).  Consequently, Williams was ultimately granted IOD leave in connection with the blood exposure injury.  (Pl. Ex. 14 at 92-93).

In January 2009, Elliott was terminated from his employment with the BPD.  (PD Ex. B at 10).  However, Williams claims that the defendants continued to engage in adverse actions against him.  In particular, Williams contends that the Police Defendants improperly denied an IOD claim that he filed in 2010.  (See Pl. Supp. SOF ¶¶ 32-33).  He further contends that the City and the Retirement Board conspired to force him into an

early retirement.  (See id. ¶ 38; Pl. SOF ¶ 14).  The facts relevant to these claims are as
follows.

### Denial of Williams' 2010 Injured on Duty Claim

During the time period from January 7, 2010 through April 5, 2010, Williams was
out of work on leave pursuant to the Family Medical Leave Act for reasons unrelated to
any issues in this case.  (PD SOF ¶ 4; PRPD ¶ 4; PD Ex. C).  The plaintiff claims at some
point during his leave, he became disabled due to symptoms resulting from work-related
PTSD.  (See PD Ex. B at 11; PRPD ¶ 4; PD Ex. C).  On April 23, 2010, not long after he
had returned to work, Williams met with defendant William Parlow, a member of the
Retirement Board, and Bill Healy ("Healy"), the president of the Brockton Police
Patrolman's Association ("Union"), in a back room at the French Club and discussed his
PTSD diagnosis.  (PRRB ¶ 2; Pl. Ex. 14 at 563; Pl. Ex. 32 at 19-20).[6]  During the
conversation, Williams informed Parlow and Healy that he intended to apply for IOD
leave based on his mental condition.  (See Pl. Ex. 14 at 563-64).  According to the
plaintiff, Parlow responded by telling the plaintiff that any such claim would be denied.
(Id. at 445-46, 516-17, 563-64).  He also urged Williams to return to work and wait until
he had signs of a physical injury before filing an IOD claim.  (Id. at 516-17).  Williams
asserts that Parlow was speaking on behalf of the Retirement Board as a whole and that

---

[6]  Williams contends, and the Retirement Board denies, that this constituted an official
meeting of the Retirement Board.  (See Pl. SOF ¶ 11; RB SOF ¶ 6).  While this dispute has
resulted in the filing of a number of affidavits and other pleadings, it does not have to be resolved.
For summary judgment purposes, this court will assume that it was an official meeting.

his statements were indicative of "the influence that the [Retirement Board] has over denying officer PTSD injured on duty claims." (Pl. Opp. to BRB (Docket No. 137) at 8-9). He also argues that Parlow's statements illustrate the Retirement Board's "custom, policy, or practice of discouraging PTSD injured on duty claims." (Id. at 9). As detailed below, however, this court finds that even assuming that Parlow was speaking on behalf of the Retirement Board, the record is insufficient to support Williams' claims against Parlow or the Retirement Board.

Williams declined to accept Parlow's advice, and later that day, on April 23, 2010, he filed a claim for IOD leave based on his PTSD. (PRPD ¶ 4; Pl. Ex. 14 at 448). The undisputed facts establish that at the time Williams submitted his claim, the City's practice was to deny all such claims initially so that the matter could be further investigated. (Pl. Supp. SOF ¶ 26; Pl. Ex. 16 at 76-79; Pl. Ex. 21 at 77-78). Accordingly, Williams' claim was denied on May 11, 2010. (Pl. Ex. S at 2). It was denied again on May 21, 2010, after the City had an opportunity to review additional information. (Id. at 1). Williams claims that the denial violated his rights under the Constitution and constituted an act of discrimination under the ADA. (See Compl. at Counts I & II).

At the time it denied Williams' claim, the City was in possession of a report from Frederick J. Welsh, LMHC, a psychologist who had met with Williams based on a referral from the BPD's Stress Officer. (Pl. Supp. SOF ¶ 33; Pl. Ex. 3). In his report, Mr. Welsh confirmed Williams' diagnosis of PTSD. (Pl. Ex. 3). He also noted that the plaintiff suffered from hypertension and work-related issues, and opined that the plaintiff

had a Global Assessment of Functioning score of 55.  (Pl. Ex. 3).  However, in denying

Williams' claim, the City did not describe why it had failed to credit Mr. Welsh's

opinion, and it provided no explanation for its decision.  (See Pl. Ex. S).

The Union filed a grievance on Williams' behalf challenging the City's denial of

his 2010 IOD claim.  (Pl. Ex. Q at 7-8).  A hearing on the grievance was held before a

hearing officer designated by the Mayor.  (Id.).  During the hearing, the parties submitted

numerous documents, including but not limited to, the letter from Mr. Welsh.  (Id. at 7).

After consideration of the parties' positions and the available evidence, the hearing

officer found that "the City was not provided sufficient medical documentation indicating

that a reoccurring injury was sustained in the performance of Officer Ken Williams'

duties as a Police Officer[,]" or "that any injury [was] casually (sic) related to his duties

as a Police Officer."  (Id. at 8).  Therefore, she denied the Union's grievance and upheld

the City's determination that Williams was not entitled to IOD leave.  (Id.).  As detailed

below, this denial was subsequently affirmed by an independent arbitrator, and the

plaintiff is not challenging the merits of the arbitrator's decision.

### Williams' Retirement From the BPD

The record establishes that when a BPD officer uses up all of his sick time, vaca-

tion time and personnel time, but is unable to work due to injury, the officer becomes

subject to termination on the grounds that he had abandoned his post.  (Pl. Supp. SOF

¶ 28).  After his 2010 IOD claim was denied, Williams believed he had only two options

that would enable him to avoid termination – quitting the police force or applying for

accidental disability retirement. (Pl. Ex. 14 at 517). Following a consultation with his wife, Williams determined that he should opt for retirement. (Id. at 518). Thus, in May 2010, while continuing to challenge the denial of his IOD leave, he submitted an application for accidental disability retirement to the Retirement Board. Therein, he claimed disability due to hypertension resulting from his job as a police officer. (See RB SOF ¶ 4; PRRB ¶ 4; Pl. SOF ¶ 24; PD Ex. C).

The process for obtaining accidental disability retirement is governed by 840 C.M.R. § 10.00. (RB Ex. 7 ¶ 2). Pursuant to the regulatory procedures established thereunder, an applicant for such retirement must appear before the Retirement Board. (Id.). If the Retirement Board accepts the applicant's written application, it is forwarded to the Public Employee Retirement Association Commission ("PERAC"), which sets up a medical panel to examine the applicant and generate a report. (Id.). The report is then sent to the Retirement Board, along with certain medical panel certificates, for consideration and approval by the Board. (Id.). Once the Retirement Board approves the medical panel certificates, it notifies PERAC and awaits PERAC's approval. (Id.). After receipt of that approval, a retirement date is established with the assistance of the applicant's employer. (Id.). In the case of a Brockton police officer, the Retirement Board relies on the BPD to designate the date of the applicant's retirement from the police force. (See Pl. SOF ¶ 29; Pl. Ex. 39 at 34-36).

Once a retirement date has been established, the retirement office calculates the applicant's disability allowance and submits it to PERAC for approval. (RB Ex. 7 ¶ 2).

PERAC then notifies the Retirement Board when the calculation has been approved. (See id.). Following the Retirement Board's receipt and consideration of such approval, the applicant is entitled to receive a retirement allowance, which is paid on the last business day of the month following final consideration by the Retirement Board. (See id. ¶¶ 2-3 and attachment thereto). The record establishes that Williams' application for accidental disability retirement was handled in accordance with this process, and that his retirement compensation was finally approved in December 2010 based on a retirement date of November 12, 2010. (See attachment to RB Ex. 7). Accordingly, Williams received his first retirement check on or about December 31, 2010. (PD SOF ¶ 8).

The plaintiff contends that his decision to apply for accidental disability retirement was involuntary, and that the City and the Retirement Board conspired to force him into retirement by denying his 2010 request for IOD leave. (See Pl. Opp. to BRB at 6-15). While this theory is not fully articulated, Williams also appears to be claiming that the City discriminated against him by failing to submit his paperwork to the Retirement Board in a timely manner, and/or by setting his retirement date at November 12, 2010 and not sooner.[7] (See Compl. ¶ 54; Pl. SOF ¶¶ 25-29). According to Williams, the delay

_____

[7] Williams also suggests that he was treated less favorably during the retirement process than other police officers who applied for accidental disability retirement. In particular, he notes that two other officers, George LeGrice and James Silva, were given retirement dates that pre-dated the scheduling of their PERAC medical panels, while Williams was given a retirement date that post-dated his PERAC medical panel by nearly four months. (See Pl. SOF ¶ 26; attachment to RB Ex. 7). He also notes that after retirement, both of those officers were receiving over $4,000 more per month in gross earnings than Williams was receiving in retirement benefits. (See Pl. SOF ¶¶ 27-28). However, the record establishes that Williams began receiving retirement benefits about a month and a half after his retirement date, while Officer Silva did not receive

-13-

resulted in a gap in his income between his November 12, 2010 retirement date and the

time when he received his first check on December 31, 2010. (See Compl. ¶¶ 54, 69).

Therefore, he claims that he was harmed as a result of the defendant's conduct.

## Arbitration of Williams' IOD Claim

Notwithstanding his pursuit of disability retirement benefits, Williams continued

to challenge the denial of his 2010 claim for IOD leave based on his PTSD. Thus,

Williams asserted a claim against the City, through the Union, in which he alleged that

the City's decision to deny his IOD request violated the terms of the collective bargaining

agreement between the City and the Union. (See Arbitration Award). The matter was

submitted to arbitration, and on February 27, 2011, an arbitrator issued a written decision

in favor of the City. (Id. at 18-19). Specifically, the arbitrator found that the Union had

failed to meet its burden of showing that the plaintiff suffered from PTSD, and that his

PTSD was caused by his employment with the BPD. (Id. at 18). As the arbitrator wrote

in his decision,

> [e]ven if Williams in fact suffers from PTSD there is insufficient
> evidence on the record of this case upon which to conclude that his
> purported PTSD is the result of traumatic incidents which he
> encountered over the years as a Brockton Police Officer and

---

benefits until five and a half months after his retirement date, and Office LeGrice did not receive
benefits until more than seven months after his retirement date. (Attachment to RB Ex. 7).
Therefore, the record does not show that Williams was treated less favorably than the other
officers during the retirement process. In addition, Williams has not cited any evidence indicating
that any discrepancies between his retirement amount and the retirement benefits received by
other officers were discriminatory or otherwise unlawful. He also has not established that the
other officers' situations were comparable to his.

Detective rather than the result of other traumatic or stressful events in his life.

(Id.).  Accordingly, the arbitrator concluded that "[t]he denial of injury-on-duty leave to Officer Ken Williams in 2010 was not a violation of the collective bargaining agreement."  (Id. at 19).  Williams does not challenge this finding in the instant case and does not contend that the arbitrator's decision was retaliatory or discriminatory in any way.

### Williams' Charge of Discrimination Against the City

On July 14, 2011, Williams filed a charge of discrimination against the City with the Equal Employment Opportunity Commission ("EEOC").  (PD Ex. B at 1).  Therein, Williams alleged that the City had discriminated against him on the basis of his race and disability, and had retaliated against him for his activities as a "whistle blower" with respect to Jose Semedo.  (Id. at 2).  The EEOC forwarded the charge to the Massachusetts Commission Against Discrimination ("MCAD") in order to protect both Williams' federal and state law rights.  (Pl. Ex. 13).  On December 6, 2011, the charge was dismissed by the EEOC with a lack of probable cause finding.  (PD Ex. B at 1).  Williams filed his complaint in the instant case on March 6, 2012.  (PD SOF ¶ 1).

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS – CITY OF BROCKTON'S MOTION FOR SUMMARY JUDGMENT

Four of the Police Defendants, including the City, Conlon, Gomes and Leary, but excluding Elliott, have filed a motion for summary judgment with respect to all of Williams' claims against them.  In support of their motion, the Police Defendants argue that each of Williams' claims is time-barred, and that Conlon, Gomes and Leary are entitled to qualified immunity with respect to Williams' claims under 42 U.S.C. § 1983 ("Section 1983").  For the reasons described below, this court finds that the plaintiff's Section 1983 claims against the Police Defendants are untimely to the extent they are based on events surrounding Williams' 2008 claim for IOD leave, and that his ADA claims are untimely since they are based on events that occurred prior to September 17, 2010.  However, the Police Defendants have not shown that they are otherwise entitled to judgment as a matter of law.

#### A.  Summary Judgment Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be

resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." PC Interiors, Ltd., 794 F. Supp. 2d at 275. "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor." PC Interiors, Ltd., 794 F. Supp. 2d at 275. "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id.

B.    **Plaintiff's Motion to Strike**

In connection with their motion, the Police Defendants have cited Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), for the proposition that they are only required to show, for purposes of summary judgment, "that there is an absence of evidence to support the non-moving party's case." (PD Mem. (Docket No.

120) at 3). They have also argued that their motion should be allowed because "there is an absence of evidence to support the Plaintiff's claims[.]" (Id.). The plaintiff has filed a "Motion to Strike *Celotex* Argument from the City's Summary Judgment Motion" in which he argues that "[i]t is the movant's burden to point out all undisputed material facts" in support of a motion for summary judgment, and that the Police Defendants have failed to meet that burden in this case. (Pl. Mot. (Docket No. 133) at 3).[8] Accordingly, he requests that the court strike the Defendants' so-called <u>Celotex</u> argument from their memorandum of law and that it further: "(1) limit the City's argument regarding First Amendment and ADA claims to the issue of statute of limitations; (2) . . . limit the City's 1983 argument to whether the City violated clearly established law; and (3) . . . limit the City's argument regarding municipal [liability] to whether Williams' custom, practice or policy claims are time barred." (Id.).

The plaintiff's motion to strike is denied. As an initial matter, Williams has not cited any authority for striking a legal argument from a party's memorandum of law. This court is fully capable of considering the parties' arguments and determining their persuasive value without any need to strike them from the record. Furthermore, even if his motion were an appropriate vehicle for limiting the Police Defendants' arguments, Williams has not shown that he is entitled to relief. As this court reads the Police

---

[8] It is unclear to this court why the defendants should be precluded as a matter of law from arguing that there is no evidence to support the plaintiff's claims, or why such an argument is inconsistent with the movant's burden to establish undisputed facts. In any event, for the reasons detailed herein, there is no reason to strike the Police Defendants' argument.

Defendants' motion, their arguments already are limited in the manner requested by the plaintiff, and they have submitted a Statement of Undisputed Material Facts to support their motion on the grounds asserted in their memorandum. Thus, there is no reason to strike any of the Police Defendants' arguments or otherwise limit the issues presented in support of their motion for summary judgment.

### C. Counts I and III: Claims Under Section 1983

In Counts I and III of his Complaint, Williams is seeking to hold the Police Defendants liable pursuant to Section 1983 for violations of his constitutional rights. Specifically, Williams alleges, in Count I, that his communications with Semedo and his testimony at Elliott's disciplinary hearing constituted protected speech under the First Amendment, and that the defendants violated his rights thereunder by:

> engag[ing] in a continuing pattern of adverse actions against
> Williams such as retaliating against Williams for engaging in
> protected conduct, by forcing Williams to take sick leave until such
> benefits were exhausted, by delaying the payment of retirement
> benefits to Williams, and by emotionally and psychologically
> damaging Williams due to Williams addressing an emergency matter
> of public concern and safety.

(Compl. ¶¶ 59-63). In Count III, Williams asserts that the Police Defendants carried out an unconstitutional custom, policy or practice "of applying coercive tactics to the disability retirees whereby the City scathes, admonishes, ridicules, delays retirement benefit payments, or otherwise takes adverse actions against the disabled that seek to

enforce their state and federal Constitutional rights."[9] (Id. ¶ 72). The Police Defendants

contend that these claims are time-barred because the plaintiff failed to file his complaint

before the applicable statute of limitations expired. (PD Mem. (Docket No. 120) at 4-6,

10-11). They also argue that Conlon, Gomes and Leary are entitled to qualified immunity

with respect to any claim relating to the denial of Williams' IOD claims. (See id. at 8-

10). For the reasons described below, this court finds that assuming, arguendo, that the

plaintiff has established a violation of his constitutional rights, the statute of limitations

precludes Williams from pursuing any Section 1983 claims arising out of his 2008 IOD

claim. However, the Police Defendants have not demonstrated that the statute of

limitations bars any claims that are based on the denial of Williams' 2010 IOD claim or

the circumstances surrounding his retirement from the BPD. Nor have they shown that

any of the individual Defendants are protected from liability under Section 1983 pursuant

to the doctrine of qualified immunity.

> ### i.   Statute of Limitations

"Section 1983 does not contain a built-in statute of limitations." Nieves v.

McSweeney, 241 F.3d 46, 51 (1st Cir. 2001). Consequently, "a federal court called upon

to adjudicate a section 1983 claim ordinarily must borrow the forum state's limitation

period governing personal injury causes of action." Id. Under Massachusetts law, the

---

[9]   Williams is also seeking attorney's fees from the Police Defendants, pursuant to 42
U.S.C. § 1988, based on their alleged violations of his constitutional rights under Section 1983.
(Compl. at Count IV).

limitations period for personal injury is three years. See id.; Mass. Gen. Laws ch. 260, § 2A. Accordingly, the three-year limitations period applies to Williams' claims that the Police Defendants' conduct deprived him of his constitutional rights in violation of Section 1983.

While the length of the statute of limitations is based on state law, "[f]ederal law determines the date on which the statute of limitations begins running." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007). Ordinarily, under federal law, "section 1983 claims accrue 'when the plaintiff knows, or has reason to know, of the injury on which the action is based.'" Id. (quoting Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 5 (1st Cir. 1994)) (additional citations omitted). However, "[t]he knowledge required is not notice of every fact which must eventually be proved in support of a claim, but rather knowledge that an injury has occurred." Tedeschi v. Reardon, 5 F. Supp. 2d 40, 44 (D. Mass. 1998) (quotations and citation omitted). See also Marrero-Gutierrez, 491 F.3d at 5-6 (explaining that "[a] claimant is deemed to 'know' or 'learn' of a discriminatory act at the time of the act itself and not at the point that the harmful consequences are felt"). Therefore, the critical question is: "at what juncture did [the plaintiff] reliably know of the injury to which this claim relates?" Tedeschi, 5 F. Supp. 2d at 44 (quoting Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 749 (1st Cir. 1994)) (punctuation omitted).

**Williams' 2008 IOD Claim**

To the extent Williams is relying on the events surrounding his 2008 IOD claim to support his Section 1983 claims, those claims are barred by the statute of limitations. As described above, Williams discovered that Elliott had failed to submit his IOD paperwork in August 2008, when he returned to work following his blood exposure injury. (Pl. Ex. 14 at 92; PD Ex. B at 9). He received notice that the City had denied his 2008 IOD claim on December 18, 2008, and was informed that the City had upheld the denial on February 25, 2009. (See Pl. Ex. U at 2, 6, 11). Accordingly, Williams knew or had reason to know of any injury resulting from these events more than three years prior to March 6, 2012, when he filed his complaint in this action. Therefore, he is barred from relying on these events to support his claims under Section 1983.

The plaintiff argues that the statute of limitations defense is unavailing because there are no facts in the record to demonstrate that he "knew or should have known that he was being retaliated against by the City, Elliot, Leary, Gomes, Conlon, or anyone else." (Pl. Opp. Mem. at 4). However, the First Circuit "has rejected the contention that claims do not accrue until the plaintiff knows of both the injury and the [retaliatory] animus." Marrero-Gutierrez, 491 F.3d at 6. Instead, the limitations period begins to run when the "discrete act" of retaliation takes place. See id. "There is simply no support for [Williams'] argument that this date ought to be suspended until he learned the [retaliatory] motives behind the discrete act." Id. Because Williams did not file his complaint within three years after the denial of his 2008 IOD claim, he may not rely on his treat-

-22-

ment in connection with that IOD claim to support his retaliation claims against the Police Defendants.[10]

## Equitable Tolling

Williams' assertion that his claims should be preserved under the doctrine of equitable tolling is similarly unpersuasive. Generally, federal courts must apply state law rules to claims for equitable tolling. See Wallace v. Kato, 549 U.S. 384, 394, 127 S. Ct. 1091, 1098, 166 L. Ed. 2d 973 (2007) ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitations."). However, Williams has not cited any Massachusetts case in which a court has applied equitable tolling under circumstances similar to those presented here. Nor has he shown that he can satisfy the elements necessary for equitable tolling to apply.

"Under Massachusetts law the doctrine of equitable tolling suspends a running statute of limitations if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." Bernier v. Upjohn Co., 144 F.3d 178, 180 (1st Cir. 1998). In order to invoke the doctrine, the plaintiff "must at the very least show that the information *could not* have been found by a timely diligent inquiry[.]" Id. In this case, Williams has failed to make the necessary showing. While Williams argues that

---

[10] While notice of retaliatory animus is not necessary to start the statute of limitations, this court notes that the plaintiff has alleged that by July 2008, and certainly by October 2008, when he testified against Elliot, the Police Defendants knew that he had advised Semedo to report Elliot. (See Compl. ¶¶ 32-33; PD Ex. B at 9-10). Therefore, he had all the information on which he now relies to establish retaliatory intent by the time his IOD claim was denied.

"no one advised [him] that he was the target of retaliation," he has not presented any evidence to show that a diligent inquiry would not have revealed the existence of a retaliatory animus behind the Police Defendants' denial of his 2008 IOD claim, assuming such an animus existed. (See Pl. Opp. Mem. at 6-7). Williams argues in support of his claim that equitable tolling should apply that the City may have engaged in an effort to conceal the details of Semedo's arrest. (Id.). Even so, as noted above, the Police Defendants knew that Williams had supported Semedo before his IOD claim was denied. See note 10, supra. Therefore, to the extent his support of Semedo's challenge to what the Police were at the time (wrongfully) claiming was a lawful arrest was the motivating factor in denying Williams' 2008 IOD claim, that information was available to Williams at the time of the alleged injury. Even assuming equitable tolling would apply to a case like this one, where the plaintiff was aware of his injury but not the motivation for the conduct that caused that injury, Williams has not established that the doctrine should apply.

### The Continuing Violation Doctrine

Williams also suggests that any claims arising out of the 2008 IOD matter should be preserved under the "continuing violation" doctrine. (See Pl. Sur-Reply (Docket No. 156) at 4-5). This court disagrees, and finds that the continuing violation doctrine is inapplicable to the facts presented in this case.

"The continuing violation doctrine is an equitable exception to the statute of limitations. It allows employees who have suffered discrimination to seek damages

where an otherwise time-barred act is part of an ongoing pattern of discriminatory acts, some of which occurred during the limitations period." Phillips v. City of Methuen, 818 F. Supp. 2d 325, 330 (D. Mass. 2011) (citing O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001)). However, "[t]he continuing violation doctrine does not apply to discrete acts of discrimination that occur on a particular day, only to 'conduct that takes place over a series of days or perhaps years.'" Id. (quoting Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (additional quotations and citation omitted). See also Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003) ("a discrete discriminatory act transpires *only* at the time it takes place, even if it was related to acts that were timely filed"). "[I]f one of the discriminatory acts standing alone is of 'sufficient permanence' that it should trigger an 'awareness of the need to assert one's rights,' then the [continuing] violation exception does not apply." Phillips, 818 F. Supp. 2d at 330 (quoting O'Rourke, 235 F.3d at 731).

The record in the instant case does not support the application of the continuing violation doctrine because Elliott's failure to submit the plaintiff's 2008 request for IOD leave, and the City's denial of his 2008 IOD claim, were "discrete act[s] of 'sufficient permanence,' which should have prompted [Williams] to assert his legal rights." Id. at 331. "Cases where the equitable exception have been applied have focused on situations where a course of discriminatory conduct took place over an extended period of time, without any single incident rising to the level of a recognizable injury." Id. The failure to submit Williams' IOD claim and the City's denial of that claim constitute "the type of

injury that is immediately recognizable as such, and that should give rise to a request for a remedy." Id. Therefore, the statute of limitations bars any claims arising out of the circumstances surrounding the plaintiff's 2008 IOD claim.

## Events of 2010

To the extent Williams' Section 1983 claims are premised upon the denial of his 2010 request for IOD leave and the events surrounding his retirement from the BPD, those claims are not time-barred. The record establishes that Williams' 2010 IOD claim was first denied on May 11, 2010, and was denied again on May 21, 2010. (Pl. Ex. S at 1-2). It also establishes that Williams applied for disability retirement in May 2010, and received final approval for such retirement in December 2010. (See attachment to RB Ex. 7). Because Williams filed his complaint in March 2012, his claims based on these events were well within the three-year statute of limitations.

## Qualified Immunity

The Police Defendants argue that even if the plaintiff's Section 1983 claims are not time-barred, the individual officers are protected from liability under the doctrine of qualified immunity. (PD Mem. at 8-10). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). "Qualified immunity balances two important interests –

the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (quotations and citations omitted). However, the Police Defendants have not shown that they are entitled to such protection.

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 232, 129 S. Ct. at 815-16 (quotations and citations omitted). In the instant case, the Police Defendants argue that qualified immunity applies because the "Plaintiff has failed to show that the Defendants' actions in delaying his IOD 2008 claim – even if it did amount to a constitutional deprivation, which Defendants deny – was somehow clearly established at the time." (PD Mem. at 9-10). However, this argument is based on too limited a reading of the plaintiff's claims. Williams does not claim that the City's denial of his 2008 IOD claim or its denial of his 2010 IOD claim deprived him of his constitutional rights. Rather, he claims that the City violated his constitutional rights by denying his IOD claims and delaying the payment of his retirement benefits in retaliation for speaking out on a matter of public concern, i.e., the arrest of Semedo. (See Compl. at Count I). At the time of the alleged violations, it was "clearly established in this circuit and the Supreme Court" that "retaliatory action in

employment, involving a public employee's speech on a question of public concern" constituted a violation of the First Amendment. <u>Rivera-Jimenez v. Pierluisi</u>, 362 F.3d 87, 95 (1st Cir. 2004). Therefore, the individual Police Defendants have not established that they are immune from liability on Williams' surviving claims against them under the doctrine of qualified immunity.

### D. Count II: Claim Against the Police Defendants Under the ADA

In Count II of his complaint, Williams alleges that the defendant officers, acting in their individual capacities, discriminated against him on the basis of his disability. Specifically, Williams alleges that

> [t]he Police Defendants engaged in a continuing pattern of adverse actions against Williams based on his disability through the date in time when he was forced to retire, such as retaliating against Williams for engaging in protected conduct, forcing Williams to take sick leave, vacation and personnel time until such benefits were exhausted, delaying the payment of retirement benefits to Williams, by making scathing remarks, and by emotionally and psychologically damaging Williams due to his disability.

(Compl. ¶ 69). The Police Defendants contend that Williams' ADA claims are barred because the plaintiff failed to file his administrative charge within the applicable limitations period. This court finds that Williams' ADA claims are time-barred to the extent they accrued prior to September 17, 2010, which was 300 days before he submitted his administrative charge to the EEOC. This court further finds that the plaintiff has not presented evidence of any discriminatory conduct which allegedly occurred after that date. Therefore, Williams' ADA claim against the Police Defendants is dismissed.

## <u>The Applicable Limitations Period</u>

"[T]he ADA mandates compliance with the procedural requirements set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4 – 2000e-9." <u>Fletcher v. Tufts Univ.</u>, 367 F. Supp. 2d 99, 106 (D. Mass. 2005). "Under those requirements, a plaintiff must first file a *timely* charge with the EEOC or an appropriate state agency before [he] may pursue an ADA claim in federal court." <u>Id.</u> (emphasis in original). As Title VII provides in relevant part:

> A charge under this section shall be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier....

42 U.S.C. § 2000e-5(e)(1). Pursuant to 42 U.S.C. § 2000e-5(e), therefore, "a plaintiff ordinarily must institute proceedings not later than 180 days after the alleged discriminatory act or practice occurred." <u>Fletcher</u>, 367 F. Supp. 2d at 107. However, "the 180-day limit is extended to 300 days in states like Massachusetts that have an anti-discrimination agency (here, the Massachusetts Commission Against Discrimination or 'MCAD') and the aggrieved person has initially instituted proceedings with that agency." <u>Id.</u>

The Police Defendants do not dispute that Williams would have had 300 days to file his ADA claim if he had initially filed his charge of discrimination with the MCAD. (PD Mem. at 7). However, they argue that because Williams filed his charge of discrimination with the EEOC, but never filed any such charge with the state agency, his "ADA claim is confined to acts described in his EEOC charge that occurred during the 180 days prior to July 14, 2011, (i.e., January 15, 2011)." (Id. at 7-8). Because Williams has not alleged any discriminatory conduct after December 31, 2010, when he received his first retirement check, the Police Defendants contend that all of his ADA claims against them are time-barred. (Id. at 8).

This court finds that the 300-day window applies to Williams' claims of discrimination under the ADA. Pursuant to a "work-sharing" agreement between the EEOC and the MCAD, "a charge filed with the EEOC is automatically referred to MCAD, the state agency, and claims filed with MCAD or the EEOC are effectively filed with both agencies."[11] Leung v. Citizens Bank, Civil Action No. 12-11060-FDS, 2014 WL 1343271, slip op. at *3 (Apr. 2, 2014). See also Seery v. Biogen, Inc., 203 F. Supp. 2d 35, 44 (D. Mass. 2002) (finding that filing of plaintiff's charge with the EEOC "'automatically initiated' proceedings at both the EEOC and the MCAD"). Because Williams' EEOC charge is deemed to have been filed with the MCAD as well, the plaintiff had 300 days after the discriminatory act or practice occurred to file his charges with the EEOC.

---

[11] The evidence indicates that Williams' charge included a request that it be filed with both the EEOC and the MCAD. (See PD Ex. B at 2).

See Fletcher, 367 F. Supp. 2d at 107 (concluding that work-sharing agreement between MCAD and EEOC "provided a 300-day window for the plaintiff to file her charges with the EEOC").

### Impact of the Limitations Period on Williams' ADA Claims

As described above, the record establishes that Williams filed his charge with the EEOC on July 14, 2011. Therefore, he is barred from pursuing any alleged acts of discrimination that occurred more than 300 days prior to that time (prior to September 17, 2010). To the extent Williams relies on the denial of his 2010 request for IOD leave to support his claims under the ADA, those claims accrued by no later than May 21, 2010, when his request was denied for a second time. (See Pl. Ex. S at 1-2). Accordingly, any such claims are untimely.

Williams urges this court to apply the continuing violation doctrine to preserve his claims under the ADA. (Pl. Opp. Mem. at 8-9). Again, this court finds that the doctrine is inapplicable to the circumstances presented in this case. The Supreme Court has held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Rivera, 331 F.3d at 188 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002)). Consequently, any charge of discrimination "must be filed within the . . . 300-day time period after the discrete discriminatory act occurred." Id. (quoting Morgan, 536 U.S. at 113, 122 S. Ct. at 2072). There can be no dispute that the City's denial of Williams' 2010 IOD claim constituted a

"discrete act" of alleged discrimination.  Accordingly, that conduct may not serve as the basis for an ADA claim.

None of Williams' other ADA claims can be found to have accrued after September 17, 2010.  Thus, the record establishes that Williams filed his application for accidental disability retirement with the Retirement Board on May 14, 2010, and he appeared at the Board meeting on June 17, 2010.  (Attachment to RB Ex. 7).  The processing of his retirement application proceeded within the statutory timeline.  For example, his medical panel certificate was received on September 22, 2010, and his retirement package was sent to PERAC on or about September 28, 2010.  (Id.).  Williams' retirement date was set as of November 12, 2010, and his retirement compensation began on December 31, 2010.  In short, Williams has not presented evidence of any discriminatory conduct or harm after September 17, 2010.

**Remaining Claims**

In summary, the plaintiff may proceed to trial on his Section 1983 claims against the Police Defendants to the extent they are based on the denial of his 2010 IOD claim and the events surrounding his retirement from the BPD.  However, the Police Defendants' motion for summary judgment is otherwise allowed.

**IV.   ANALYSIS – RETIREMENT BOARD'S
MOTION FOR SUMMARY JUDGMENT**

The plaintiff also has asserted claims against the Retirement Board Defendants pursuant to Section 1983.  In Count I, Williams claims that those Defendants retaliated

against him, in violation of his rights under the First Amendment, by "forcing Williams to take sick leave until such benefits were exhausted, by delaying the payment of retirement benefits to Williams, and by emotionally and psychologically damaging Williams due to Williams addressing an emergency matter of public concern and safety." (Compl. ¶ 62). In Count III, Williams is seeking to hold the Retirement Board liable, pursuant to Section 1983, for engaging in "a custom, policy or practice of assisting the Police Defendants in applying coercive tactics to the disability retirees whereby the Retirement Board Defendants delay retirement benefit payments, or otherwise take[ ] adverse actions against the disabled that seek to enforce their state and federal Constitutional rights." (Id. ¶ 73). Finally, Williams is seeking attorney's fees from the Retirement Board Defendants, pursuant to 42 U.S.C. § 1988, based on their alleged violations of his consti-tutional rights under Section 1983. (Id. at Count IV). "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). In the instant case, the Retirement Board Defendants do not dispute that they were acting under color of state law at all relevant times. However, they contend that Williams has failed to prove that their conduct violated any of his constitu-

tional rights.[12]  This court agrees and finds that the Retirement Board Defendants are entitled to summary judgment with respect to all of Williams' claims against them.

<h2 align="center">Claims for Retaliation Under Section 1983</h2>

Williams first claims that the Retirement Board Defendants retaliated against him, in violation of his First Amendment right to free speech, for speaking out about "[t]he abuse of Semedo at the hands of the BPD[.]"  (Compl. ¶ 60).  "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of a protected right[.]"  Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25 (1st Cir. 2010) (quoting Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)).  Accordingly, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  Id. (quoting Hartman, 547 U.S. at 256, 126 S. Ct. 1695).  In this case, however, the record is devoid of evidence showing that any member of the Retirement Board retaliated against Williams or engaged in any action that was motivated by his speech.  Therefore, the Retirement Board Defendants are entitled to summary judgment on Count I of Williams' complaint.

---

[12]  The Retirement Board Defendants also argue that they are entitled to qualified immunity under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2.  (RB Mem. (Docket No. 123-4) at 4-5).  However, the plaintiff has not asserted any claims under that statute, and there is no basis for applying the provisions of the state Tort Claims Act to claims asserted under Section 1983.  See Mellinger v. Town of West Springfield, 401 Mass. 188, 195-96, 515 N.E. 2d 584, 589 (1987) ("Chapter 258 addresses itself to State governmental liability for torts, not for constitutional deprivations").  Accordingly, there is no merit to the Retirement Board Defendants' assertion that they are immune from liability under Chapter 258.

The record demonstrates that the Retirement Board was responsible for processing Williams' application for accidental disability retirement. It also demonstrates that the Retirement Board performed that task in accordance with applicable regulatory procedures, and that Williams' application for retirement benefits was finally approved by the Board in December 2010. (See RB Ex. 7 and attachment thereto). Williams' contention that the Retirement Board Defendants retaliated against him by delaying the payment of his benefits is defeated by the record.[13] Moreover, this claim is undermined by Williams' own allegation that any problems in the processing of his application were caused by the City's failure to participate in the process in a timely manner. (See Compl. ¶ 54). Finally, Williams has not presented any evidence showing that the Retirement Board was motivated in any way by Williams' testimony at Elliott's disciplinary hearing or by communications that he had in connection with the Semedo affair.

Similarly, there is no record support for Williams' conclusory assertion that the Retirement Board Defendants engaged in unlawful retaliation by "forc[ing] Williams into retirement for assisting Semedo and on account of Williams PTSD[.]" (See PRRB ¶ 5). According to the plaintiff, he was "forced" into retirement at the April 23, 2010 meeting with Parlow.[14] There is no dispute for purposes of this summary judgment motion that

_____

[13] In fact, the record establishes that Williams' application tracked that of Ronald Schuberth, who submitted his application just a few days after Williams. Both officers began on the retirement payroll on December 31, 2010. (See attachment to RB Ex. 7).

[14] As described in note 5, supra, the Retirement Board Defendants dispute that this meeting was a meeting of the Retirement Board, as opposed to an informal get together. That issue does not need to be resolved. For purposes of summary judgment, this court will assume

during the meeting, Parlow told Williams that any IOD claim based on the plaintiff's PTSD would be denied, and that he urged Williams to return to work until Williams could seek IOD leave based on a physical injury.  (Pl. Ex. 14 at 445, 563-64).  These facts, however, are insufficient to establish that Williams' constitutional rights were violated.

As an initial matter, it is undisputed that Williams ignored Parlow's advice, and filed a claim for IOD leave based on his PTSD immediately following the meeting with Parlow.  (Id. at 448).  Moreover, no reasonable finder of fact could conclude from this evidence that Parlow or any other members of the Retirement Board had any role in the City's decision to deny Williams' 2010 IOD claim or were somehow responsible for forcing Williams to seek disability retirement.[15]  The evidence submitted by the plaintiff establishes that the City's practice was to deny all such IOD claims initially so that the matter could be further investigated.  (Pl. Supp. SOF ¶ 26; Pl. Ex. 16 at 76-79; Pl. Ex. 21 at 77-78).  Thus, Parlow's statement that Williams' claim would be denied merely predicted the likely outcome of Williams' request for leave.  It did not establish or even suggest that Parlow or the Retirement Board had anything to do with the City's decision

that Parlow was officially representing the Board.

[15]  Williams contends that the "collusion" between the Retirement Board Defendants and the City is proved by the fact that the Retirement Board's counsel in this litigation represents the City in connection with some grievances.  (See Pl. Opp. to BRB at 8).  This claim was fully explored in connection with the plaintiff's motion to disqualify counsel.  (See Docket Nos. 93 & 105).  This court found the argument to be without merit then and no additional information has been submitted in connection with the motion for summary judgment that would alter this court's earlier conclusion.

to reject Williams' claim (a rejection which was ultimately upheld by an independent arbitrator).  In addition, there is no indication that Parlow's efforts to convince Williams to return to work until he could submit a physical IOD claim reflected anything other than an effort to assist Williams in obtaining approval for his desired leave.

Finally, even if it were assumed that Parlow "collaborated" with the City to deny Williams' IOD claim and force him into retirement (see Pl. Opp. to BRB at 6), the plaintiff has not presented any evidence to show that Parlow's actions were retaliatory or that they violated Williams' First Amendment rights.  Williams has pointed to no concrete facts indicating that Parlow's statements to him had any connection to the plaintiff's protected speech, or that any members of the Retirement Board even had knowledge of Williams' involvement in the events surrounding Semedo's arrest. "Summary judgment is generally appropriate against the nonmoving party where that party relies on conclusory allegations, improbable inferences and unsupported speculation" rather than factual evidence.  Neponset Landing Corp. v. Northwestern Mut. Life Ins. Co., 902 F. Supp. 2d 149, 160 (D. Mass. 2012) (internal quotations omitted). The Retirement Board Defendants are entitled to judgment as a matter of law with respect to Count I of Williams' complaint.

### Claim of Unconstitutional Custom, Policy or Practice

As described in Count III, the plaintiff is also seeking to hold the Retirement Board liable for carrying out an unconstitutional custom, policy or practice "of assisting the Police Defendants in applying coercive tactics to the disability retirees[.]"  (Compl.

¶ 73). In support of this claim, the plaintiff contends that the Retirement Board main-tained an unconstitutional practice of denying Brockton police officers' PTSD IOD claims and forcing those officers to resign from the BPD. (See Pl. Opp. to BRB at 8-10, 13-15). For the reasons that follow, this court finds that the Retirement Board is entitled to judgment as a matter of law with respect to this claim as well.

Assessing liability against a local government entity such as the Retirement Board "requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the [local government entity] be responsible for that violation . . . ." Young v. City of Providence, 404 F.3d 4, 25-26 (1st Cir. 2005). In order to meet the second element, "a plaintiff must show that a policy or custom of the [local govern-ment entity] led to the constitutional deprivation alleged. This requires that plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989) (internal citation omitted). Significantly, no liability can attach where the actions of the local government officials "inflicted no constitutional harm." Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013) (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)).

Once again, Williams has failed to present evidence showing that the Retirement Board Defendants deprived the plaintiff of his constitutional rights. As described above, there is no evidence showing that the Retirement Board had any part in determining the outcome of police officers' IOD claims. Rather, the record establishes that such deci-

sions were made by the City. In addition, the plaintiff has not presented any evidence, or provided an explanation, as to how any alleged involvement by the Retirement Board constituted a violation of the plaintiff's constitutional rights.[16] Accordingly, summary judgment shall enter in favor of the Retirement Board Defendants with respect to Count III of the plaintiff's complaint.

In light of this court's determination that the Retirement Board Defendants are entitled to summary judgment on both of Williams' substantive claims against them, Williams is foreclosed from seeking attorney's fees from those Defendants pursuant to 42 U.S.C. § 1988. Therefore, summary judgment shall enter in favor of the Retirement Board Defendants with respect to Count IV of the complaint as well.

## V. CONCLUSION

For all the reasons described herein, the plaintiff's "Motion to Strike *Celotex* Argument From the City's Summary Judgment Motion" (Docket No. 133) is DENIED, the "Motion for Summary Judgment of the Defendants, Brockton Retirement Board, William R. Farmer, William E. Parlow, Matthew J. McLaughlin, Edward P. Mack & Heidi A. Chuckran" (Docket No. 123) is ALLOWED, and the "Defendants City of Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Motion for Summary Judgment" (Docket No. 119) is ALLOWED IN PART and DENIED IN PART. The

---

[16] In any event, it is undisputed that the denial of Williams' 2010 IOD claim based on PTSD was upheld by an independent arbitrator. Therefore, it is unclear whether Williams' claim is actionable under Section 1983.

matter shall proceed to trial on the plaintiff's Section 1983 claims against the Police

Defendants, to the extent that they are premised upon the denial of Williams' 2010

request for IOD leave and the events surrounding his retirement from the BPD.

    / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge
