UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KEN WILLIAMS,                    )
                                 )
            Plaintiff,           )          CIVIL ACTION
        v.                       )          NO. 12-10430-JGD
                                 )
THE CITY OF BROCKTON, et al.,    )
                                 )
            Defendants.          )

# MEMORANDUM OF DECISION AND ORDER ON
# DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

November 13, 2015

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Ken Williams ("Williams"), is a former officer in the Brockton,

Massachusetts Police Department ("BPD").  On March 6, 2012, Williams brought this civil rights

action against the City of Brockton, four present and/or former officers of the BPD,[1] the

Brockton Retirement Board, and five individual members of the Retirement Board (collectively,

the "Retirement Board Defendants").  Williams claims, in essence, that the defendants engaged

in a pattern of retaliation against him after he advised an African-American businessman, Jose

Semedo ("Semedo"), to file a complaint with the Internal Affairs Division of the BPD accusing

one of Williams' fellow police officers, defendant Lon Elliott, with false arrest and racially

offensive conduct.  The matter is presently before the court on the "Defendants City of

---

[1]  The defendant police officers include the former Chief of the BPD, William K. Conlon ("Conlon"); the Interim Chief of the BPD, Emmanuel Gomes ("Gomes"); Officer Brian Leary ("Leary"); and former Officer Lon Elliott ("Elliott").

Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Motion for Summary Judgment" (Docket No. 238).  The moving parties shall be referred to collectively as the "Police Defendants."  Elliott is not a party to the motion, and is the only defendant who is not included as one of the "Police Defendants."

The present motion is the second motion for summary judgment that has been filed by the Police Defendants in this case.[2]   In July 2014, both the Police Defendants and the Retirement Board Defendants filed motions for summary judgment with respect to all of Williams' claims against them.  On November 13, 2014, this court issued an order ("Summary Judgment Order") allowing the Retirement Board Defendants' motion for summary judgment in its entirety, allowing in part and denying in part the Police Defendants' motion for summary judgment, and ordering that the case proceed to trial on Williams' claims against the Police Defendants under 42 U.S.C. § 1983 ("Section 1983"), but only to the extent that those claims were premised upon the denial of Williams' 2010 request for injured on duty ("IOD") leave and the events surrounding his retirement from the BPD.  In addition, because the plaintiff's surviving claims against the Police Defendants remained unclear, this court issued a separate order directing Williams to file a statement defining the scope of the claims that he intended to pursue at trial.

Williams subsequently filed a Statement of the Case in which he attempted to describe the nature of his remaining claims.  The Police Defendants then filed a Motion for

---

[2]  Elliott has not participated in the summary judgment process at all, and this court understands that Williams is continuing to pursue his claims against that defendant.  However, for many of the reasons described in this court's decisions on the motions for summary judgment brought by other defendants, the claims against Elliott are also unlikely to survive as a matter of law.

Reconsideration in which they argued that Williams had failed to articulate a basis for a finding

of liability against any of the individual officers, and renewed their request for summary

judgment with respect to all of Williams' surviving claims.  While this court found that

reconsideration of its Summary Judgment Order was inappropriate, it agreed that the scope of

the plaintiff's claims remained ambiguous.  Accordingly, during a pretrial conference held on

December 2, 2014, this court gave Williams another opportunity to clarify his claims prior to

trial.  Williams represented that he intended to prove that the Police Defendants had violated

his First Amendment rights by retaliating against him for engaging in protected speech

pertaining to the arrest of Semedo.  He also indicated that he intended to prove that the Police

Defendants had deprived him of his rights to procedural and substantive due process by failing

to address his claim for IOD leave based on hypertension and forcing him into an early

retirement.  There is no dispute that Williams' complaint contained no due process claims, and

that no such claim had ever been raised.  Nevertheless, after consideration of the parties'

arguments, this court decided that justice would best be served by allowing the plaintiff leave

to assert those claims in an amended pleading, and by giving the defendants an opportunity to

challenge the new claims, as well as Williams' First Amendment claims against the individual

officers, in an appropriate motion.  Thus, at the close of the conference, this court instructed

Williams to amend his complaint for the purpose of articulating the claims that he had

identified in court and defining how his constitutional rights were allegedly violated by the

denial of his 2010 IOD claim and the circumstances leading to his retirement from the BPD.  It

also granted the Police Defendants leave to file a new motion for summary judgment, if

appropriate, addressing the plaintiff's claims of liability against the individual officers, as well as any new issues raised by the amended pleading.

The plaintiff has since filed a Corrected First Amended Complaint and the Police Defendants have filed the pending motion for summary judgment.  While the Corrected Complaint adds claims for violations of Williams' rights to procedural and substantive due process as this court had contemplated, it does little to define the scope his claims or to narrow the issues for trial.  Instead, Williams has used his amended pleading to expand upon facts relating to the arrest of Semedo and its aftermath, to extend the scope of his First Amendment claims for retaliation against the Police Defendants, to increase the number of claims asserted against the Police Defendants, and to substantively shift the focus of his case.  In his Corrected Complaint, Williams has combined these factual assertions into Section 1983 claims against the Police Defendants for violations of his constitutional rights to freedom of speech (Count I), procedural due process (Count II) and substantive due process (Count III).  In addition, he is seeking to hold the City of Brockton ("City" or "Brockton") liable under Section 1983 for carrying out an unconstitutional custom, policy or practice "of applying coercive tactics to the disabled worker" (Count IV), and to recover attorney's fees from all of the Police Defendants pursuant to 42 U.S.C. § 1988 (Count V).

By their present motion for summary judgment, the Police Defendants contend that Williams has failed to articulate a cognizable claim under any of the legal theories set forth in his Corrected Complaint, and that therefore, they are entitled to judgment as a matter of law with respect to all of Williams' claims against them.  For all the reasons detailed below, this court finds that the plaintiff has failed to present sufficient evidence to support a viable claim

against any of the Police Defendants.  Accordingly, their motion for summary judgment is

ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[3]

When ruling on a motion for summary judgment, "[t]he Court must view the entire

record in the light most hospitable to the non-moving party and indulge all reasonable

inferences in that party's favor."  <u>PC Interiors, Ltd. v. J. Tucci Constr. Co.</u>, 794 F. Supp. 2d 274,

275 (D. Mass. 2011).  In this case, that task has been complicated by the frequency with which

the plaintiff has shifted his factual and legal theories, and by his failure to articulate those

theories with any clarity.  Accordingly, the following statement of facts reflects this court's best

effort to describe the facts that are relevant to Williams' present claims in the light most

favorable to the plaintiff.

---

[3]  The parties have adopted the statements of fact that were filed previously in connection with the defendants' original motions for summary judgment.  Therefore, the facts set forth in this court's prior Summary Judgment Order ("SJ Order") remain accurate, and this court will continue to rely on them to the extent they are relevant.  The facts are also derived from the following materials, which were filed by the parties in connection with the present motion: (1) Defendants City of Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Supplemental Statement of Undisputed Material Facts in Support of Summary Judgment (Docket No. 240) ("DF"), and Exhibits A through D attached thereto ("Def. Ex. __"); (2) the Affidavit of Ken Williams (Docket No. 247) ("Williams Aff."); (3) Plaintiff, Ken William's Response to the Defendants', Conlon, Gomes, and Leary's Statement of Undisputed Material Facts in Support of Summary Judgment, which is set forth on pages 1 through 7 of Docket No. 248 ("PR"); (4) Williams' Statement of Additional Undisputed Material Facts, which is set forth on pages 7 through 14 of Docket No. 248 ("PAF"); (5) Williams' Statement of Disputed Material Facts, which is set forth on pages 14 through 16 of Docket No. 248 ("PDF"); and (6) the exhibits set forth in Docket No. 249 ("Pl. Ex. __").  In a separate Memorandum of Decision and Order on Plaintiff's Motions to Strike, which has been issued separately on this date, this court has allowed the plaintiff's motion to strike the Affidavit of Mary Milligan, which is attached as Exhibit E to the Defendants City of Brockton, William Conlon, Emmanuel Gomes and Brian Leary's Supplemental Statement of Undisputed Material Facts in Support of Summary Judgment.  Accordingly, this court has not considered Ms. Milligan's Affidavit or incorporated her statements into the above Statement of Facts.

## Williams' Employment at the BPD

The plaintiff, Williams, was employed as a police officer at the BPD from approximately

October 1995 until his retirement on November 12, 2010.  (SJ Order at 4).  He initially

performed work as a patrolman, but was later promoted to the position of Generalist

Detective.  (Id. at 4-5).  Williams, who is African-American, claims that during his tenure with

the BPD, he was one of only a handful of minority police officers who were employed by the

City.  (Corr. Compl. (Docket No. 232) ¶ 9).  There is no dispute that Williams performed well in

his job, even earning an award as a "Top Cop" in the spring of 2009.  (SJ Order at 5).

## The Arrest of Jose Semedo

As indicated above, the present lawsuit arises out of events that took place following

the arrest of an African American businessman named Jose Semedo.  Semedo was arrested on

a warrant by officers from the BPD on November 20, 2007.  (Id.).  One of the arresting officers

was defendant Elliott, who was then a Sergeant with the BPD.  (Id.).  During the arrest, Semedo

attempted to convince Elliott that the warrant had been recalled, but Elliott refused to confirm

that the warrant remained outstanding.  (Id.).  Elliott also made racially offensive remarks to

Semedo, and mocked Semedo using racially offensive gestures.  (Id.).

Following his arrest, Semedo appeared in Brockton District Court where he was released

from custody.  (Id.; PAF ¶ 18).  He then went to the bus station where Williams happened to be

working a police detail.  (SJ Order at 5).  Semedo approached Williams and entered a discussion

with the plaintiff in which Semedo recounted the details of his arrest, including Elliott's racist

comments.  (Id.).  Williams was shocked by Elliott's use of racist language and believed that

Semedo had been the victim of a crime.  (PAF ¶ 21).  However, due to the policies existing at

the BPD at the time, Williams was precluded from filing a complaint against Elliott directly due to Elliott's status as a ranking officer.  (Id. ¶ 22).  Therefore, Williams advised Semedo to file a complaint with the BPD.  (SJ Order at 5-6).

Semedo took Williams' advice, and submitted a letter to the Internal Affairs Division of the BPD in which he described the circumstances of his arrest, including the manner in which Elliott had treated him during the course of the incident.  (Id. at 6).  In January 2008, the Internal Affairs Division of the BPD launched an investigation into Semedo's complaint against Elliott.  (Id.).  Williams claims that at some point during the course of the investigation, each of the defendant officers learned about Williams' role in advising Semedo to report the offending conduct.  (See PDF ¶ 61).  It is Williams' contention that the individual Police Defendants took steps to cover up the facts relating to Semedo's arrest, and to protect the officers who had been involved in the incident.  (See Corr. Compl. ¶¶ 52-59).  Eventually, however, details of the incident were revealed and Elliott's employment with the BPD was terminated.

## Williams' Role in Elliott's Disciplinary Hearing

In about October 2008, Williams received a summons to appear and testify at a disciplinary hearing regarding Elliott's conduct toward Semedo.  (SJ Order at 7).  Prior to the hearing, Williams encountered one of the Police Defendants, Emmanuel Gomes, in the hall outside the hearing room.  (Id.).  According to the plaintiff, Gomes attempted to discourage him from testifying adversely against Elliott.  (Id.).  However, Williams ignored Gomes' suggestion, and provided testimony that was damaging to Elliott.  (Id. at 7-8).  Both Elliott and the Chief of the BPD, defendant William K. Conlon, were among the individuals who were present at the hearing.  (Id.).  Consequently, they were able to hear Williams' testimony against Elliott.  (Id.).

Williams claims that his communications with Semedo, and his testimony at Elliott's hearing, constituted protected speech under the First Amendment.  (Corr. Compl. ¶¶ 101-02). He also claims that Elliott and the Police Defendants violated his rights under the First Amendment by harassing him and taking adverse actions against him in retaliation for engaging in protected speech.  (Id. ¶¶ 104-06).  There is no dispute that Elliott was terminated from his employment with the BPD in January 2009.  (SJ Order at 8).  Nevertheless, Williams claims that even after Elliott left the Department, the Police Defendants continued to retaliate against him by, among other things:

> denying his request for a work accommodation, by not giving him light duty, by not sending him to [a] physician capable of performing a fitness for duty examination, by forcing Williams to take sick leave, vacation time, personnel time, by causing him to exhaust his financial resources, and by placing him into a cycle known to them which would result in damage to Williams' financial resources, reputation, and other interests.

(Corr. Compl. ¶ 104).  The facts relevant to these allegations are as follows.

### Williams' 2010 PTSD Diagnosis

During the time period from January 7, 2010 through April 5, 2010, Williams was out of work on leave, pursuant to the Family Medical Leave Act, for reasons that are unrelated to the issues in this case.  (SJ Order at 9).  At some point while he was still on leave, Williams began to experience symptoms of stress and PTSD.  (See Pl. Ex. 14 at 135).  The BPD's stress officer, James Smith, referred Williams to Frederick J. Welsh, a licensed mental health counselor.  (Id.; Def. Ex. B).  Williams met with Welsh for the first time on April 5, 2010.  (Def. Ex. B).  During his consultation with Welsh, Williams reported that he was experiencing a variety of symptoms, including nightmares, sleep disturbances, night sweats, heart palpitations and intrusive thoughts.  (Id.).  Welsh diagnosed Williams with PTSD.  (Id.).  Moreover, in a report that Welsh

prepared on April 24, 2010, Welsh opined that Williams' mental health condition had been triggered by a number of traumatic incidents that had occurred years earlier, while Williams was engaged in his duties as a police detective. (Id.). Welsh also noted that Williams had a history of hypertension, and that he was receiving treatment for that condition from his primary care physician. (Id.). There is no dispute that as a result of his PTSD diagnosis, Williams could not return to work until he was able to obtain a medical determination that he was fit for duty as a police officer. (See PR ¶ 10; Def. Ex. A at 137).

At some point during the time period between April 5, 2010 and April 23, 2010, Williams met with Conlon in Conlon's office at the BPD. (Pl. Ex. 14 at 546-47). During the conversation, Williams spoke about his PTSD. (Id.). In particular, Williams tried to assure Conlon that his symptoms of PTSD were real, and that he had been battling those symptoms off and on for years. (Id. at 547). He also informed Conlon that his PTSD had adversely impacted his overall health, and had caused his physical condition to decline. (Pl. Ex. 42 at Ans. No. 17). Conlon responded by telling Williams that he should "[g]o to the gym and work it out." (Id.; Pl. Ex. 14 at 546-47). Williams asserts that Conlon's reaction to his complaints "was part of the continuing cycle of discrimination and adverse treatment afflicted by the City against disabled officers like [himself.]" (Pl. Ex. 42 at Ans. No. 17).

The parties dispute whether, during his conversation with Conlon, Williams asked Conlon to grant him an accommodation that would enable him to return to work on light duty status. (See DF ¶ 3; PR ¶ 11). According to Williams, he was looking to obtain an appropriate accommodation that would take effect after it was determined that he was fit to return to duty. (Pl. Ex. 14 at 547-48). While it is not clear from the record that Williams actually requested

9

such an accommodation during his meeting with Conlon in April 2010, this court will assume that he did so for purposes of the present motion, and that the request was denied.  (See id.; Pl. Ex. 42 at Ans. No. 17).  Even under such circumstances, however, Williams has not presented any evidence linking Conlon's conduct to Williams' discussion with Semedo or otherwise suggesting that Conlon's refusal to grant him an accommodation was motivated by retaliatory animus.

There is no dispute that Gomes, in his capacity as the Captain of Internal Affairs for the BPD, contacted the plaintiff during the same time period and suggested that the plaintiff return to work.  (Pl. Ex. 14 at 136-37).  During their conversation, Gomes indicated that if Williams returned, the BPD could give him an accommodation.  (Id. at 137).  Williams responded that he did not see how such an option was possible, given that he was in treatment for PTSD and was not yet fit for duty.  (Id.).  Although Gomes stated that he would need to get back to Williams about the situation, he never contacted Williams or discussed the matter with him again.  (Id.).

### Denial of Williams' 2010 Injured on Duty Claim

On April 23, 2010, Williams filed a claim for IOD leave.  (SJ Order at 10; Pl. Ex. 46 at 1). As Williams stated in support of his claim:

> While in the performance of my duties I was injured on January 25, 2004. The previously submitted claim for indemnification of medicals was approved – February 17, 2004.  Some weeks after my return to work in 04' I had a general conversation with the department stress officer rep. Det. Paul Washek regarding my shooting incident and its adverse affects. I told Paul Washek then I believed I suffered from PTSD but was optimistic things would improve over time.  Unfortunately they have not. The nightmares and flashbacks are just as intense today as they were in

> 04'.  Just recently I was diagnosed with recurring severe PTSD injury by
> the Employee Assistance clinician Fred Welsh.[4]

(Pl. Ex 46 at 1).  Williams went on to describe in detail the symptoms of his PTSD, and he listed

the nature of his injuries as "Serious Post Traumatic Stress Disorder."  (Id.).  Nevertheless, he

now claims for the first time that his request for IOD benefits was based on both his PTSD and

his hypertension, and that the City acted improperly by "split[ting] Williams' post-traumatic

stress disorder claim from his hypertension claim," so as to deprive Williams of consideration

for IOD leave based on hypertension.  (See PDF ¶ 72; Corr. Compl. ¶¶ 96-98).  As described

below, no matter whether Williams' IOD claim is characterized as a claim based on PTSD, a

claim based on hypertension, or a claim based on a combination of both, this court finds that

the facts relating to that claim are insufficient to support the imposition of liability against any

of the Police Defendants.

In his IOD claim, Williams did mention that he had been diagnosed with hypertension

and diabetes as well as PTSD.  (Pl. Ex. 46 at 2).  However, he explained that "PTSD is the result

of a call while in the performance of my duties[,]" and that the "[h]ypertension is secondary to

[the] PTSD injury."  (Id.).  He further stated in relevant part that "I have been in denial all these

years about the seriousness of my injury but the nightmares and flashbacks have become

unbearable.  I am currently in counseling with Fred Welsh and my primary care doctor has been

treating me for the hypertension and diabetes."  (Id.).  Mr. Welsh's report confirming Williams'

---

[4] Williams has used various spellings of Welsh's last name in his pleadings and exhibits.  For purposes of
simplicity, this court has used "Welsh" throughout this Memorandum of Decision, even where an
alternative spelling has been used in a quotation.

diagnosis of PTSD and describing it as work-related was submitted to the City in support of the plaintiff's IOD claim.  (See SJ Order at 11; PAF ¶ 44; Pl. Ex. 3).

At the time Williams submitted his 2010 claim for IOD leave to the City, the City's practice was to deny all such claims initially so that the matter could be further investigated.  (SJ Order at 10).   Accordingly, Williams' claim was denied initially on May 11, 2010.  (Id.).  It was denied again on May 21, 2010, after the City had an opportunity to review additional information.  (Id.).  In July 2010, following Williams' submission of further medical documenta-tion, the City confirmed its decision to deny Williams' claim for IOD leave, after finding that the medical evidence was insufficient to establish a causal relationship between Williams' illness and his work as an officer of the BPD.  (See Pl. Ex. Q at 10).

The Brockton Police Patrolman's Association ("Union") filed a grievance on Williams' behalf challenging the City's denial of his 2010 IOD claim, and a hearing on the grievance was held by a hearing officer who had been designated by the Mayor of Brockton.  (SJ Order at 11). During the hearing, the parties submitted numerous documents, including but not limited to, the report from Mr. Welsh.  (Id.).  After consideration of the parties' positions and the available evidentiary materials, the hearing officer concluded that "the City was not provided sufficient medical documentation indicating that a reoccurring injury was sustained in the performance of Officer Ken Williams' duties as a Police Officer[,]" or "that any injury [was] casually (sic) related to his duties as a Police Officer."  (Id.).  Accordingly, she denied the Union's grievance and upheld the City's determination that Williams was not entitled to IOD leave.  (Id.).  As described below, the denial of Williams' IOD claim was subsequently affirmed by an independent arbitrator, and the plaintiff is not challenging the merits of the arbitrator's decision.

**Williams' Retirement from the BPD**

The record establishes that when a BPD officer uses up all of his sick time, vacation time and personnel time, but is unable to work due to injury, the officer becomes subject to termination on the grounds that he has abandoned his post.  (Id. at 12; PAF ¶ 41).  After his IOD claim was denied, Williams believed he had only two options that would enable him to avoid this scenario – quitting the police force or applying for accidental disability retirement.  (SJ Order at 12).  Following a discussion with his wife, Williams decided that it would be best under the circumstances to seek disability retirement.  (Id.).  Thus, in May 2010, while continuing to challenge the denial of his IOD claim, Williams submitted an application for accidental disability retirement to the Brockton Retirement Board ("BRB").  (Id.).  In support of his application, Williams claimed disability due to hypertension resulting from his job as a police officer.  (Id.).

The record demonstrates that the BRD was responsible for processing Williams' request for accidental disability retirement in accordance with the regulatory procedures set forth in 840 C.M.R. § 10.00.  (See SJ Order at 12-13).  It also establishes that his retirement compensation was finally approved in December 2010, based on a retirement date of November 12, 2010, and that Williams received his first retirement check on or about December 31, 2010.  (Id. at 13).

The plaintiff insists that his decision to apply for accidental disability retirement was involuntary, and that the City forced him into retirement by denying his 2010 request for IOD benefits in retaliation for his having supported Semedo.  (See PR ¶¶ 5-6; Corr. Compl. ¶¶ 79-80).  He also claims that after he was approved for retirement, he "was not reimbursed by the City [his] normal wages which [he] lost in 2010 due to [his] heart condition."  (Williams Aff. ¶ 6).

13

While Williams' theories remain unclear, despite having had repeated opportunities to define

his claims, this court assumes him to be claiming that the City's denial of his 2010 IOD claim

effectively deprived him of his employment in violation of his constitutional rights.  (See Pl.

Opp. Mem. (Docket No. 245) at 15-19).  For the reasons detailed below, this court finds that the

facts, even when viewed in the light most favorable to the plaintiff, are insufficient to sustain

any such claim.

### The Arbitration of Williams' IOD Claim

Notwithstanding his pursuit of disability retirement benefits, Williams continued to

challenge the denial of his 2010 claim for IOD leave.   Thus, Williams asserted a claim against

the City, through the Union, in which he alleged that the City's decision to deny his IOD request

violated the terms of the collective bargaining agreement between the City and the Union.  (SJ

Order at 14).  The matter was submitted to arbitration, and on February 27, 2011, an arbitrator

issued a written decision in favor of the City.  (Id. at 14-15).   Specifically, the arbitrator

determined that the Union had failed to meet its burden of showing that Williams suffered

from PTSD, and that his PTSD was caused by his employment with the BPD.  As the arbitrator

stated in his decision:

> [e]ven if Williams in fact suffers from PTSD there is insufficient evidence
> on the record of this case upon which to conclude that his purported
> PTSD is the result of traumatic incidents which he encountered over the
> years as a Brockton Police Officer and Detective rather than the result of
> other traumatic or stressful events in his life.

(Id. at 15).  Accordingly, the arbitrator concluded that "[t]he denial of injury-on-duty leave to

Officer Ken Williams in 2010 was not a violation of the collective bargaining agreement."  (Id.).

Williams does not take issue with the arbitrator's decision, and is not challenging that decision in this action.

Additional factual details are described below where appropriate.

### III.  ANALYSIS

#### A.      Summary Judgment Standard of Review

The Police Defendants have moved for summary judgment on each Count of Williams' Corrected Complaint.  "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd., 794 F. Supp. 2d at 275 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  Thus, the burden is on the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must

view the entire record in the light most hospitable to the non-moving party and indulge all

reasonable inferences in that party's favor."  <u>PC Interiors, Ltd.</u>, 794 F. Supp. 2d at 275.  Even so,

the court must "ignore conclusory allegations, improbable inferences, and unsupported

speculation."  <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir. 2009) (quotations and

citations omitted).  "Summary judgment is appropriate if, after viewing the record in the non-

moving party's favor, the Court determines that no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law."  <u>PC Interiors, Ltd.</u>, 794 F. Supp. 2d at

275.

**B.      Count I: Section 1983 Claim for Retaliation**

Williams claims, in Count I of his Corrected Complaint, that the Police Defendants should

be held liable under Section 1983 because they retaliated against him for exercising his First

Amendment right to engage in free speech.  Specifically, Williams alleges that his

communications with Semedo and his testimony at Elliott's disciplinary hearing constituted

protected speech under the First Amendment, and that the defendant officers

> conspired to retaliate against Williams for exercising his right to free
> speech by damaging his car, by denying his request for a work
> accommodation, by not giving him light duty, by not sending him to [a]
> physician capable of performing a fitness for duty examination, by forcing
> Williams to take sick leave, vacation time, personnel time, by causing him
> to exhaust his financial resources, and by placing him into a cycle known
> to them which would result in damage to Williams' financial resources,
> reputation, and other interests.

(Corr. Compl. ¶¶ 101-04).  "A claim under section 1983 has two essential elements.  First, the

challenged conduct must be attributable to a person acting under color of state law" and

"second, the conduct must have worked a denial of rights secured by the Constitution or by

federal law."  <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st Cir. 1997).  In the instant case, the Police

Defendants do not dispute that they were acting under of color of state law at all relevant times.  At issue is whether the record supports a claim that their conduct violated Williams' right to free speech.  For the reasons detailed below, this court finds that this issue must be resolved in favor of the Police Defendants.

## Elements of a First Amendment Retaliation Claim

"It is well settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'" Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010)) (additional citation omitted).  In the public employment context, however, this right is not unlimited.  As the Supreme Court explained in Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  This is because

> [g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

Garcetti, 547 U.S. at 418-19, 126 S. Ct. at 1958 (internal citation omitted).  Consequently, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (quoting City of San Diego v. Roe, 543 U.S. 77, 80, 125 S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004)) (alteration omitted).

In accordance with the guidance set forth by the Supreme Court, including the Court's
discussion in <u>Garcetti</u>, the First Circuit has established the following three-part test for deter-
mining whether an adverse employment action violates a public employee's right of free
speech:

> First, a court must determine "'whether the employee spoke as a citizen
> on a matter of public concern.'" *Curran v. Cousins*, 509 F.3d 36, 45 (1st
> Cir. 2007) (quoting *Garcetti*, 547 U.S. at 418, 126 S. Ct. 1951).  Second,
> the court must "balance ... the interests of the [employee], as a citizen, in
> commenting upon matters of public concern and the interest of the
> State, as an employer, in promoting the efficiency of the public services it
> performs through its employees." *Id.* at 44 (quoting *Pickering v. Bd. of
> Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)) (omission
> in original).  Third, the employee must "show that the protected
> expression was a substantial or motivating factor in the adverse
> employment decision." *Id.* at 45.

<u>Decotiis</u>, 635 F.3d at 29.  In the event all three elements of the test "are resolved in favor of the
plaintiff, the employer may still escape liability if it can show that 'it would have reached the
same decision even absent the protected conduct.'"  <u>Id.</u> at 29-30 (quoting <u>Rodriguez-Garcia v.
Miranda-Marin</u>, 610 F.3d 756, 765-66 (1st Cir. 2010)).  As a general matter, the first two factors
are matters of law for the court, whereas the last two factors ordinarily present questions of
fact for the jury.  <u>Wagner v. City of Holyoke</u>, 241 F. Supp. 2d 78, 90 (D. Mass. 2003), <u>aff'd</u>, 404
F.3d 504 (1st Cir. 2005).  For the reasons detailed herein, this court finds the record insufficient
to determine if Williams engaged in protected speech.  Nevertheless, this court finds that
Williams has failed to establish that his speech was a substantial or motivating factor in any
adverse employment decision.  Therefore, summary judgment shall enter in favor of the Police
Defendants on Williams' First Amendment retaliation claim.

**Nature of Williams' Speech**

The first issue that the court must consider is whether Williams is entitled to First Amendment protection because was speaking as a citizen on a matter of public concern at the time he spoke to Semedo about the allegedly unlawful arrest, and at the time he testified against Elliott at the 2008 disciplinary hearing.  The Defendants argue that all of the relevant speech in this case occurred while Williams was carrying out his responsibilities as a police officer and employee of the BPD.  (Def. Mem. (Docket No. 239) at 7).  Therefore, they contend that his speech does not merit First Amendment protection.  (Id.).  The plaintiff argues that the Police Defendants waived any challenge to the protected nature of his speech by failing to address that issue in connection with their first motion for summary judgment.  (Pl. Opp. Mem. (Docket No. 245) at 4).  However, as described above, this court indulged Williams by giving him repeated opportunities to articulate actionable claims against the Police Defendants, and even allowed him to add new claims alleging violations of his right to due process.  In exchange, this court specifically allowed the Police Defendants to challenge Williams' claims, including his First Amendment claims, against the individual officers, and to address any new issues presented in the amended complaint.  Under the circumstances, and especially in light of the fact that Williams has used his amended complaint to expand upon his First Amendment claims, Williams' assertion of waiver is entirely without merit.  Accordingly, this court finds that it is appropriate to address the Defendants' argument.

The first step in the First Amendment analysis "itself has two subparts: the plaintiff must establish (a) that he spoke as a citizen and (b) that the speech was on a matter of public concern."  Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 146 (D. Mass. 2009).  Ordinarily, the

question "[w]hether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry."  Curran, 509 F.3d at 46.  However, "[i]f the topic of speech 'is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the form and context of the expression.'"  Id. (quoting Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 233 (1st Cir. 2005)) (internal quotations omitted).  Here, there can be little doubt that Williams' communications regarding Elliott's misconduct and racially offensive behavior toward Semedo involved matters of inherent concern to the public.  See id. (listing "official malfeasance" as a matter of inherent concern to the public); Bolduc, 629 F. Supp. 2d at 146 ("The Court is willing to assume that the speech at issue – communications corroborating a racist remark by a fellow police officer – addressed a matter of public concern");  Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 224 (D. Mass. 2002) (finding that statements made by plaintiff regarding corruption and racism in local police department "*were* on matters of public concern"), aff'd, 362 F.3d 1 (1st Cir. 2004).  Therefore, Williams has satisfied this element of his retaliation claim.

The question whether Williams was speaking as a citizen or in his capacity as a police officer presents a more difficult issue.  "In *Garcetti*, the Supreme Court held that public employees do not speak as citizens when they 'make statements pursuant to their official duties,' and that accordingly, such speech is not protected by the First Amendment."  Decotiis, 635 F.3d at 30 (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1951).  However, the Supreme Court has since clarified that the mere fact that an individual's speech "relates to public employment or concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech."  Lane v. Franks, 134 S. Ct.

2369, 2379, 189 L. Ed. 2d 312 (2014).  Instead, "[t]he critical question under _Garcetti_ is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those issues."  Id.

In order to determine whether Williams' speech occurred pursuant to his ordinary duties as a police officer, this court is required to "take a hard look at the context of the speech."  Decotiis, 635 F.3d at 32.  The First Circuit has set forth a list of non-exclusive factors to guide courts in their evaluation.  Id.  Those factors include:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at [his] place of employment; whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of [his] employment; and whether there is a so-called citizen analogue to the speech.

Id. (internal citations omitted).  Ultimately, however, "the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform, and not merely those formally listed in the employee's job description."  Id. at 31 (quotations and citations omitted).

This court finds that the record is not sufficiently developed to render a final determination on this issue.  Although the Police Defendants argue that all of the relevant communications occurred while Williams was performing his duties as a police officer, they have not presented any evidence regarding the scope of his job responsibilities.  (See Def. Mem. at 7).  Nor have they attempted to apply the First Circuit's list of factors to the evidence presented in this case.  (See id.).  Moreover, while there is no dispute that Williams was working

a police detail at the time he advised Semedo to file a complaint with the BPD, Williams

contends that his job responsibilities "did not include advising other citizens to report the

crimes of other police officers or expressing his personal views to citizens." (PAF ¶ 22). He has

also presented evidence showing that at various times after his first encounter with Semedo,

Williams and Semedo engaged in communications while the plaintiff was off-duty. (Id. ¶ 23; Pl.

Ex. 14 at 70-71, 73-75). In short, the Police Defendants have not demonstrated, at least at this

stage in the proceedings, that Williams was speaking in his capacity as a police officer at the

time of the communications at issue. Therefore, they have not shown that they are entitled to

judgment as a matter of law on this issue.

### Lack of Evidence of Retaliatory Motive

The Police Defendants argue that Williams' First Amendment claims must fail in any

event because the alleged acts of retaliation are untimely or because the evidence is

insufficient to establish any acts of retaliation. (See Def. Mem. at 7-11). This court finds that

Williams has failed to present sufficient evidence to establish that his protected speech was a

substantial or motivating factor in the alleged adverse employment actions. Accordingly, the

motion for summary judgment must be allowed with respect to Count I of Williams' Corrected

Complaint.

### Alleged Damage to Williams' Car

Williams first alleges that the Police Defendants violated his First Amendment rights by

causing damage to his car in retaliation for his protected speech. (Corr. Compl. ¶ 104). What is

missing from the record, however, is any evidence that any of the Police Defendants were

responsible for any such damage. In his Corrected Complaint, Williams has alleged that "Elliott

was the person who had damaged his car" and has failed to cite any facts linking any of the Police Defendants' actions to the alleged harm. (See id. ¶ 69). Consequently, the Police Defendants are entitled to judgment as a matter of law on this claim. See Horne v. City of Boston, 509 F. Supp. 2d 97, 111-12 (D. Mass. 2007) (finding that plaintiffs could not withstand summary judgment where they failed to present any evidence linking defendants' actions to the adverse employment action).

Even if Williams had presented evidence of a causal connection between the Police Defendants' actions and damage to his car, his claim would still be barred by the statute of limitations. As this court explained in its prior Summary Judgment Order, a three-year limitations period applies to Section 1983 claims that have been asserted in the federal courts of Massachusetts. (SJ Order at 21). A claim accrues for statute of limitations purposes "when the 'discrete act' of retaliation takes place." (Id. at 23 (quoting Marrero-Gutierrez v. Molina, 491 F.3d 1, 6 (1st Cir. 2007)). In the instant case, Williams alleges that his car was damaged sometime in 2008. (Corr. Compl. ¶ 69). Because he did not file his initial complaint until March 6, 2012, he cannot rely on that alleged incident to support a retaliation claim.

### Alleged Denial of Williams' Request for Accommodation

The plaintiff also claims that the Police Defendants violated his First Amendment rights by denying his request for a work accommodation and failing to give him a light duty assignment in retaliation for his participation in the Semedo matter. (Corr. Compl. ¶ 104). As described above, this court has assumed that Conlon refused Williams' request for an accommodation upon his return to duty following his treatment for PTSD. Nevertheless, this claim must fail because Williams has not presented any facts to show that his communications

with Semedo or his testimony at Elliott's disciplinary hearing was a factor, much less a

substantial or motivating factor, for Conlon's denial.  Thus, Williams has produced no direct

evidence linking Conlon's actions to the plaintiff's protected speech.  Nor has he presented

circumstantial evidence that would support a claim that Conlon's conduct was retaliatory.  To

the extent Williams is relying on Conlon's statement that Williams should "[g]o to the gym and

work it out," there is nothing about that statement that would support a reasonable inference

that Conlon was motivated by the plaintiff's communications with Semedo or his testimony at

Elliot's disciplinary hearing.  (See Pl. Ex. 42 at Ans. No. 17).  Moreover, the record establishes

that Williams' conversation with Conlon took place in April 2010, almost two and a half years

after Williams advised Semedo to file his complaint with the BPD, and a year and a half after

Williams' testified at the hearing.  The significant gap between the protected speech and the

denial of Williams' request for an accommodation further undermines any suggestion that

Conlon's conduct was retaliatory.  See Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003)

(finding that year and a half gap between protected speech and elimination of plaintiff's job

undermined any inference that his speech played a substantial or motivating role in adverse

employment action).

      Williams' belief that Conlon's comments were indicative of Conlon's discrimination

toward his disability still lacks any nexus to protected speech and, therefore, is similarly

inadequate to support his claim.  (See Pl. Opp. Mem. at 13).  "[E]ven if [Conlon's] decision was

based on an 'improper motivation,' there is nothing beyond speculation permitting the

inference that [his] improper motivation was related to [Williams'] protected speech."  Putnam

v. Town of Saugus, Mass., 365 F. Supp. 2d 151, 176 (D. Mass. 2005).  "Such speculation is

insufficient to defeat a motion for summary judgment."  Id.

To the extent Williams is basing his claim on his conversation with Gomes, any such

claim must fail as well.  The record establishes that Gomes suggested that Williams might be

able to obtain an accommodation if he were to return to work in 2010.  (Pl. Ex. 14 at 136-37).

The fact that he failed to contact Williams again after the plaintiff explained that he had not

been approved as being fit for duty is far from sufficient to support an inference that Gomes

was retaliating against Williams for any protected speech.

### Alleged Failure to Arrange for a Fitness for Duty Examination

Williams next claims that the Police Defendants retaliated against him "by not sending

him to [a] physician capable of performing a fitness for duty examination[.]"  (Corr. Compl. ¶

104).  Although this claim has not been fully developed, it appears to arise out of Williams'

referral to Welsh for treatment of his PTSD.  Thus, as the plaintiff alleges in his Corrected

Complaint:

> 91.    Williams thought that he was assigned to Welsh by Conlon to
> receive treatment so that he could eventually return to work as a
> police officer.  Under BPD policies, an officer on injured on duty
> cannot return until they pass a fitness for duty examination.

> 92.    Williams believed Welsh was part of the Employee Assistance
> program and would eventually provide a fitness for duty
> examination for Williams to enable him to return to work.  Welsh
> was not part of the Employee Assistance Program and was not
> capable of providing a fitness for duty examination.

This claim too is insufficient to withstand summary judgment in the Police Defendants' favor.

The undisputed facts establish that Williams was referred to Welsh by the BPD Stress

Officer, James Smith, after he began to experience symptoms of stress and PTSD.  (See Def. Ex.

B; Pl. Ex. 14 at 135).  There is no evidence showing that Conlon or any of the other individual

Police Defendants had any responsibility for the referral or had any influence over the selection

of Welsh.  Furthermore, even if there were such evidence, the record fails to support an

inference that Williams' protected speech was a substantial or motivating factor in the referral.

Instead, the evidence indicates that the referral was motivated by nothing more than Williams'

own complaints of symptoms associated with PTSD.  (See Def. Ex. B; SJ Order at 9, 11).  Accord-

ingly, the Police Defendants are entitled to judgment as a matter of law on this claim as well.

Denial of Williams' Claim for IOD Leave

Finally, the plaintiff claims that the Police Defendants "conspired to retaliate against

Williams for exercising his right to free speech by . . . forcing Williams to take sick leave,

vacation time, personnel time, by causing him to exhaust his financial resources, and by placing

him into a cycle known to them which would result in damage to Williams' financial resources,

reputation, and other interests."  (Corr. Compl. ¶ 104).  The Defendants argue that any such

acts were "not acts of retaliation."  (Def. Mem. at 11 n. 4).  While the factual basis for this claim

remains ambiguous, this court will assume that it relates to the denial of Williams' 2010 claim

for IOD leave.  For the reasons that follow, this court agrees Williams has failed to present any

factual support for his assertion that the denial was retaliatory.

To the extent Williams is seeking to hold the individual Police Defendants liable on this

theory, he has failed to present facts showing that they had any say in the denial of his IOD

claim or that the denial had anything to do with Williams' protected speech.  Rather, the record

shows that his claim for IOD leave was submitted to the City Solicitor's office on April 23, 2010,

and was denied the City Solicitor, Philip C. Nessralla, Jr., on May 11, 2010.  (Pl. Ex. S).  On May

21, 2010, the City Solicitor denied the claim again, following his review of additional

information.  (Id.).  Finally, on July 13, 2010, Assistant City Solicitor, Katherine M. Feodoroff,

wrote a letter in which she stated in relevant part as follows:

> Based upon additional medical information provided by Mr. Williams, or
> lack thereof, please be advised that the City's decision to deny Mr.
> Williams's claim for indemnification of lost wages and medicals remain
> denied.
>
> It is the City's position that there is insufficient medical documentation
> relating to Mr. Williams's claim for hypertension/stress to obtain an
> adequate medical opinion from a City designated physician to properly
> address the issue of causal relationship.

(Pl. Ex. Q at 10).  Therefore, the undisputed facts, including the plaintiff's own evidence, belie

any suggestion that the defendant officers were responsible for the denial of Williams' IOD

claim, or that they acted in retaliation for Williams' protected speech.

In his Corrected Complaint, Williams alleges that Conlon was responsible for denying

claims for IOD leave in the first instance pursuant to a City policy under which all such claims

were denied automatically.  (Corr. Compl. ¶¶ 81-82).  Specifically, the plaintiff alleges that

"[u]nder the City's policy, police officers would submit [IOD] claims to the Chief of Police,

William Conlon[,]" and "Conlon would then automatically deny the [IOD] claim for the police

officers."  (Id. ¶ 82).  As an initial matter, the record does not support Williams' allegations that

Conlon had any responsibility for handling IOD claims or for carrying out the alleged policy.

Moreover, even if such evidence existed, it would not support Williams' First Amendment claim

because any suggestion that Conlon's actions were retaliatory would be defeated by the fact

that Conlon was merely carrying out an established municipal policy and was not acting in

response to Williams' involvement with Semedo.

27

To the extent Williams is attempting to hold the City liable for retaliation based on the City Solicitor's denial of his request for IOD leave, that claim fares no better.  In order to prevail on a claim of municipal liability under Section 1983, the plaintiff must satisfy "two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation . . . ."  Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005).  To meet the second element, "a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged.  This requires that plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm."  Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989) (internal citation omitted).  Significantly, however, no liability can attach where the actions of the local government officials "inflicted no constitutional harm."  Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013) (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)).  Because Williams has not presented any evidence showing that those responsible for the decision to deny his IOD claim even had knowledge of his involvement with the Semedo matter, no reasonable jury could conclude that the City denied his IOD claim in retaliation for his protected speech.[5]  Accordingly, summary judgment shall enter in favor of the Police Defendants on Count I of Williams' Corrected Complaint.

---

[5] In his Statement of Disputed Material Facts, Williams asserts that "[t]he City and [the Brockton Retirement Board] forced Williams into retirement for assisting Semedo."  (PDF ¶ 65).  This conclusory statement is insufficient to raise a genuine issue of fact.  See Sullivan, 561 F.3d at 14 (on summary judgment, court ignores "conclusory allegations, improbable inferences, and unsupported speculation" (quotations and citations omitted)).  Although the plaintiff has cited a number of exhibits in support of his statement, this court is unable to find any evidence in the cited materials that actually supports a causal link between the plaintiff's protected speech and the City's denial of his IOD claim.

## C.    Count II: Claim for Violation of Right to Procedural Due Process

In Count II of his Corrected Complaint, Williams claims that the Police Defendants

violated his Fourteenth Amendment right to procedural due process by effectively suspending

him and discharging him from his employment without adequate notice and an opportunity to

be heard.[6]   As in the case of his retaliation claims, the basis for this claim is far from clear.   In

his opposition to the motion for summary judgment, Williams has attempted to define this

claim as follows:

> *First*, Williams had a significant interest in his job (i.e, means of
> livelihood) as tenured civil servant.  *Second*, the risk of erroneous
> deprivation in Williams's job by denying Williams the April 23, 2010 IOD
> claims was extremely high as borne out by the facts in many ways,
> especially under Chapter 32, 111F,[7] and the terms of the [Collective
> Bargaining Agreement], Articles 8.2 and 8.17.[8]  Clearly, Williams

---

[6]  Williams also alleges, in Count II of his Corrected Complaint, that the Police Defendants violated his right to equal protection.  (Corr. Compl. ¶ 108).  However, it does not appear that Williams is pursuing an equal protection claim, as he has failed to explain how any such rights were violated by the Police Defendants' actions.  (See Pl. Opp. Mem. at 15-19).  Moreover, in order to support a claim for equal protection in this context, the plaintiff must establish that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).  In his Complaint, Williams has alleged that at the time he submitted his 2010 claim for IOD leave, the City had a standard policy and practice of automatically denying such claims.  (Corr. Compl. ¶¶ 81-83).  He has also alleged that other police officers who applied for IOD leave based on PTSD were, like Williams, forced to rely on sick time, vacation time, and person-nel time after their applications for paid leave were denied.  (Id. ¶¶ 84-87).  Accordingly, Williams' own allegations undermine any suggestion that he was treated differently than other, similarly situated police officers.

[7]  It appears that Williams intended to refer to Mass. Gen. Laws ch. 41, § 111F, the statute that authorizes incapacitated police officers to obtain paid leave, or IOD leave.

[8]  Article 8.2 of the Collective Bargaining Agreement ("CBA") between the Union and the City, which was in effect in 2010, provides for "compensation in full amount equal to normal full pay" when a police officer is absent from duty because of an illness or injury sustained in the line of duty for which he is entitled to compensation under Massachusetts statutory law.  (Pl. Ex. 46 at CBA, Art. 8.2).  Article 8.17 provides in relevant part that a police officer claiming reoccurrence of an injured on duty incident "may be examined … as to incapacity by a physician designated by the City, but if no determination on his

> submitted a reoccurring injured on duty claim[ ] on April 23, 2010.  The
> City had 30 days to designate a physician to examine his reoccurring
> injury claim while it processed injured on duty.  The City failed to
> designate a physician to assess Williams or to approve his claim during
> the same time period.  This caused Williams to use his sick time, vacation
> time, personal time when he should have been paid his normal wages
> until such time as the IOD process finalized in *2011*.  Notwithstanding the
> arbitrator's *2011* ruling on Williams' PTSD claim from April 23, 2010, if an
> accommodation was provided or 8.17 was followed, Williams would not
> have been forced to submit or continue with any retirement process [in]
> May 2010 and subsequently be forced out of the BPD door by November
> 12, *2010*.  By not providing the accommodation or following 8.17, the
> Defendants were able to suspend, suspend without pay, and to discharge
> Williams without following Chapter 31[9] or the CBA.  By not following
> these mechanisms, the Defendants took away Williams' Constitutionally
> protected interest in his job due to lack of notice and a chance to be
> heard in a timely manner.

(Pl. Opp. Mem. at 18 (internal citations omitted)).  This court finds that there is no

factual or legal support for such a claim.

"In order to establish a procedural due process claim under § 1983, 'a plaintiff

must allege first that [he] has a property interest as defined by state law and, second,

that the defendants, acting under color of state law, deprived [him] of that property

interest without constitutionally adequate process.'"  Bolduc, 629 F. Supp. 2d at 147

(quoting SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 139 (1st Cir. 2005)) (alterations in

original).  Williams appears to argue that his employment as a police officer is the

relevant property interest at issue in this case.  "With certain exceptions not relevant

here, the Fourteenth Amendment protects government employees 'who possess

---

status is made in and within thirty (30) days from his claim of reoccurrence, the Officer will be entitled
to be carried injured on duty."  (Pl. Ex. 46 at CBA, Art. 8.17).

[9]  Mass. Gen. Laws ch. 31 is the Massachusetts civil service law.

property interests in continued public employment.'" Id. (quoting Maymi v. Puerto Rico

Ports Auth., 515 F.3d 20, 29 (1st Cir. 2008)).   Nevertheless, Williams cannot establish

that the Police Defendants "terminated his employment – that is, deprived him of that

property – without 'constitutionally adequate process.'"  Id.  Therefore, his claim must

fail.

The undisputed facts establish that Williams was not terminated or suspended from his

employment.  Instead, the record shows that he was denied IOD leave and, as a result, Williams

decided to apply for accidental disability retirement.  Williams does not contend, nor could he,

that he had any constitutionally protected interest in paid IOD leave.  See Lamoureux v. Haight,

648 F. Supp. 1169, 1173 (D. Mass. 1986) ("[T]he right to be granted leave without loss of pay is

clearly conditioned on the Town's determination that the injury was work-related.  Until

plaintiff is found to have a work-related injury, he does not have a property right" (quoting

Packish v. McMurtrie, 539 F. Supp. 548, 550 (D. Mass. 1982)).  Accordingly, he cannot base his

due process claim on an argument that the City mishandled or denied his claim for such leave.

See id. (until plaintiff's injury was found to be work-related, "he did not have a property right

on which a claim of an alleged deprivation of due process could be predicated").

Even if it arguably could be said that Williams was effectively deprived of his

employment with the BPD, the plaintiff would not be able to maintain a procedural due process

claim against the Police Defendants.  "When a deprivation of a property interest is occasioned

by random and unauthorized conduct by state officials, . . . the [Supreme] Court has repeatedly

emphasized that the due process inquiry is limited to the issue of the adequacy of post-

deprivation remedies provided by the state."  Bolduc, 629 F. Supp. 2d at 148 (quoting Lowe v.

Scott, 959 F.2d 323, 340 (1st Cir. 1992)) (alteration and punctuation in original).  Thus, "if a state provides adequate post-deprivation remedies – either by statute or through the common-law tort remedies available in its courts – no claim of violation of procedural due process can be brought under Section 1983 against the officials whose random and unauthorized conduct caused the deprivation."  Id. (quoting Lowe, 959 F.2d at 340).  Under the Massachusetts Civil Service Law, Mass. Gen. Laws ch. 31, "any government employee aggrieved by a decision of his 'appointing authority' may appeal to the Civil Service Commission and be given a hearing before a member of the Commission."  Id.  See also Mass. Gen. Laws ch. 31, § 43.  Furthermore, "[i]f the employee is dissatisfied with the Commission's decision, he or she may appeal to the Superior Court within thirty days after receipt of such order or decision."  Bolduc, 629 F. Supp. 2d at 148 (citing Mass. Gen. Laws ch. 31, § 44).   Accordingly, the statute provided Williams with "an adequate post-deprivation remedy" and the Police Defendants are entitled to summary judgment on his claim for violation of his Fourteenth Amendment right to procedural due process.

During the pretrial conference that took place on December 2, 2014, Williams argued that the Police Defendants deprived him of his due process rights by failing to address his claim for IOD leave based on hypertension.  Moreover, in his Corrected Complaint, Williams has alleged that the City "split Williams' post-traumatic stress disorder claim from the hypertension claim" so as to deprive him of consideration for IOD leave based on hypertension.  (See Corr. Compl. ¶¶ 96-98).  These allegations are inconsistent with Williams' prior arguments in this case that he became disabled due to PTSD, and filed his 2010 claim for IOD leave based on his PTSD.  (See SJ Order at 9-10).  They are also at odds with the factual record, which shows that

Williams' claim for IOD leave was based on PTSD, that his hypertension was "secondary to [the] PTSD injury[,]" and that the City Solicitor's office specifically considered his hypertension in connection with its decision to deny Williams' IOD claim.  (See Pl. Ex. 46 at 1-2; Pl. Ex. Q at 10). In any event, it is immaterial whether Williams' IOD claim was based on PTSD, hypertension or a combination of both because Williams cannot support a claim for violation of his constitutional rights under any possible scenario.  Because Williams cannot show that he had a constitution-ally protected property interest in IOD benefits, he cannot establish that the City's handling of his IOD claim, including any splitting off of the PTSD claim from the hypertension claim, deprived him of his right to due process.  If Williams wished to challenge the City's handling of his hypertension claim, he should have raised that issue below in the context of the arbitration proceeding.[10]

### D.      Count III: Claim for Violation of Right to Substantive Due Process

Williams' next claim, which is set forth in Count III of his Corrected Complaint, alleges that the Police Defendants deprived him of his right to substantive due process.  In order to prevail on such a claim, the plaintiff must establish both that the Defendants' actions "shock the conscience," and that they "violated a right otherwise protected by the substantive Due Process Clause."  Martinez v. Cui, 608 F.3d 54, 64 (1st Cir. 2010).  See also DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005) (explaining, in action against police officer, that abuse of power by members of "the executive branch of state government sinks to a level cognizable

---

[10]  To the extent Williams claims that the City violated his First Amendment rights by failing to consider his hypertension in connection with his claim for IOD leave, this court finds that any such claim cannot withstand summary judgment.  As described above, Williams has failed to submit any evidence linking the City's actions to his role in the Semedo matter.  Therefore, he cannot support a claim that the City acted in retaliation for Williams' protected speech.

under the Due Process Clause only when it is so extreme and egregious as to shock the

contemporary conscience").[11]  This court finds that Williams has failed to present evidence

showing that the Police Defendants engaged in any conscience shocking behavior.   Therefore,

the Defendants are entitled to summary judgment with respect to Count III of the Corrected

Complaint.

"There is no scientifically precise formula for determining whether executive action is –

or is not – sufficiently shocking to trigger the protections of the substantive due process branch

of the Fourteenth Amendment."   Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011)

(quoting Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)).   Nevertheless, the case law estab-

lishes that such action "must be truly outrageous, uncivilized, and intolerable, and the requisite

arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."  Id.

(internal quotations and citations omitted).   Moreover, the "hallmark of successful challenges is

an extreme lack of proportionality, as the test is primarily concerned with violations of personal

rights so severe, so disproportionate to the need presented, and so inspired by malice or

sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and

inhumane abuse of official power literally shocking to the conscience."  Id. (quoting Gonzalez-

Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010)) (punctuation omitted).

---

[11]  The plaintiff argues that the relevant standard for purposes of his substantive due process claim is
whether the Police Defendants' actions were arbitrary and capricious.  (See Pl. Opp. Mem. at 19).  That
argument is inconsistent with the controlling authority.  As the First Circuit explained in Martinez, the
Supreme Court has "clarified that the shocks-the-conscience test … governs all substantive due process
claims based on executive, as opposed to legislative, action."  Martinez, 608 F. 3d at 64.  Therefore, the
"shocks-the-conscience" standard is applicable to Williams' claim in this case.  See DePoutot, 424 F. 3d
at 118 (finding that substantive due process claim against police officer involved executive branch action
that warranted application of the shocks-the-conscience standard).

No such circumstances have been presented here.  As described above, Williams has not presented sufficient evidence to show that the Police Defendants retaliated against him for advising and supporting Semedo, and even if he had, such conduct on the part of the Defendants would not have been adequate to support a substantive due process claim.  See Frei v. Town of Holland, 212 F. App'x. 4, 6, 2007 WL 29702, at *1 (1st Cir. Jan. 5, 2007) (per curiam) ("The substantive due process claim based on allegations of perjury, falsification of documents, *and retaliatory action*, fails under this circuit's case law" (emphasis added)).  Nor has Williams shown that he was terminated or suspended from his job.  The City's denial of his IOD leave, which was upheld by an independent arbitrator, can hardly be described as conscience shocking conduct.  See Harron, 660 F.3d at 536 (finding that Town's alleged actions in forcing plaintiff out of business by refusing to grant him a liquor license was insufficient to support a substantive due process claim).   Similarly, any refusal by Conlon to grant Williams a work accommodation, especially where the plaintiff had not yet been treated and deemed fit to return to duty, falls far short of the type of "'truly horrific' circumstances" required to prove a substantive due process claim.  See id.  Therefore, the Police Defendants' motion will be allowed with respect to this claim.

### E.    Count IV: Claim for Municipal Liability

In Count IV, Williams is seeking to hold the City liable, pursuant to Section 1983, for violating his rights under the Fifth and Fourteenth Amendments.  In support of this claim, Williams alleges that the City of Brockton

> has a custom, policy, or practice of applying coercive tactics to the disabled worker including, but not limited to, causing financial and emotional anguish, by ridiculing the disabled worker, constructively discharging the disabled worker, and by automatically denying their

> injured on duty claim regardless of what medical documentation that
> disabled worker submits to the City of Brockton.

(Corr. Compl. ¶ 117).  To the extent Williams is claiming that the City deprived him of his

Fourteenth Amendment rights to procedural and/or substantive due process, any such claims

must fail for the reasons articulated above.  To the extent Williams is claiming that the City

violated his rights under the Fifth Amendment, he has failed to explain how such a claim exists

under the facts of this case.  "The Fifth Amendment states that no person 'shall be compelled in

any criminal case to be a witness against himself.'"  Singer v. State of Maine, 49 F.3d 837, 845

(1st Cir. 1995) (quoting U.S. CONST. amend. V).  Because there are no facts which would

implicate the Fifth Amendment, the Police Defendants' motion is allowed with respect to Count

IV.[12]

### V.  CONCLUSION

For all the reasons described herein, the "Defendants City of Brockton, William Conlon,

Emmanuel Gomes and Brian Leary's Motion for Summary Judgment" (Docket No. 238) is

ALLOWED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[12]  In light of this court's determination that the Police Defendants are entitled to summary judgment on all of Williams' substantive claims against them, Williams is foreclosed from seeking attorney's fees from those Defendants under 42 U.S.C. § 1988.  Therefore, summary judgment shall enter in favor of the Police Defendants with respect to Count V of the Corrected Complaint.